# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3568 | **DATE** | 2/5/2004 |
| **CASE TITLE** | Nevarez, et al. vs. O'Connor Chevrolet, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ .

(3) ☐ Answer brief to motion due ___ . Reply to answer brief due ___ .

(4) ☐ Ruling/Hearing on ___ set for ___ at ___ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ set for ___ at ___ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ___ set for ___ at ___ .

(7) ☐ Trial[set for/re-set for] on ___ at ___ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ at ___ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status set for 2/17/04 at 9:45 a.m. For the reasons set out in the Memorandum Opinion and Order, Defendants' Motion for Summary Judgment [57-1] on Counts I and II is GRANTED in part and DENIED in part. Summary judgment is entered in favor of the defendant O'Connor Chevrolet, Inc. on Count I of the Second Amended Class Action Complaint, but denied as to Count II, and Defendants' request to dismiss Counts III through VII for lack of subject matter jurisdiction is moot.

*Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 75 |
| | Notified counsel by telephone. | FEB 06 2004 | |
| | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | 2/5/2004 | |
| GR | courtroom deputy's initials | date mailed notice | |
| | | GR | |
| | | mailing deputy initials | |

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

FEB 0 6 2004

JESUS and LETICIA NEVAREZ, )
on behalf of themselves and all others )
similarly situated, )
         Plaintiffs, )
 )
v. )
 )
O'CONNOR CHEVROLET, INC. )
and EVERGREEN FINANCE )
COMPANY, )
        Defendants. )

Cause No. 02 C 3568

Magistrate Judge Geraldine Soat Brown

## MEMORANDUM OPINION AND ORDER

Defendants O'Connor Chevrolet, Inc. ("O'Connor") and Evergreen Finance Company

("Evergreen") (collectively, "Defendants") move for summary judgment against Plaintiffs Jesus and

Leticia Nevarez ( collectively, "Plaintiffs") on Counts I and II of the Second Amended Class Action

Complaint. [Dkt 57.][1] Defendants also request dismissal of Counts III through VII if summary

judgment is granted on Counts I and II. For the reasons set out below, summary judgment in favor

of Defendants is granted on Count I but denied on Count II, and Defendants' request to dismiss

Counts III through VII is moot.[2]

---

[1] In their Memorandum in Opposition to Defendants' Motion for Summary Judgment
[dkt 60], Plaintiffs attempt to cross-move for summary judgment on Count II. (Pls.' Mem. Opp'n
at 6-14.) However, as the parties were advised at a hearing on October 1, 2003, because
Plaintiffs never actually filed or properly noticed for presentment a cross-motion for summary
judgment, the court will not consider their arguments in support of summary judgment on Count
II.

    Additionally, no motion for class certification has been filed.

[2] This opinion refers to Defendants, collectively, because both O'Connor and Evergreen
moved for summary judgment on Counts I and II and requested dismissal of Counts III through
VII. However, since Counts I and II were brought *only* against O'Connor, the summary



## JURISDICTION

Federal jurisdiction exists under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." A complaint that specifically invokes federal law "'arises under' federal law for purposes of § 1331." *International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Phillip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999). Federal question jurisdiction is proper for Counts I and II because Count I invokes the Truth in Lending Act, 15 U.S.C. § 1640(e), and Count II invokes the Equal Credit Opportunity Act, 15 U.S.C. 1691e.[3] Supplemental jurisdiction exists over Counts III through VII under 28 U.S.C. §1367. 28 U.S.C. § 1367 provides that, with the exception of actions brought solely under 28 U.S.C. §1332:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Because the court has original jurisdiction over Counts I and II, and Counts III through VII are related state law claims, supplemental jurisdiction is proper. Although a court may decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c), none of the circumstances set forth in § 1367(c) exist in this case. The parties have consented to the jurisdiction

---

judgment rulings are directed towards and affect only O'Connor.

[3] Plaintiffs assert that federal question jurisdiction also arises under the Motor Vehicle Information and Cost Savings Act, 49 U.S.C. § 32710 ("MVICSA") (Compl. ¶ 5.) However, Plaintiffs have not alleged a MVICSA claim in their Second Amended Class Action Complaint.

of a Magistrate Judge. [Dkt 7, 8.]

## FACTUAL BACKGROUND[4]

According to Plaintiffs, in late April or early May 2001, Leticia Nevarez contacted O'Connor via telephone, asked for a representative who spoke Spanish and was connected to Juan Soto ("Soto"). (Compl. ¶¶ 7-9.)[5] During that conversation, Leticia Nevarez allegedly told Soto that she

---

[4] To the extent relevant facts were set forth in the parties' Local Rule 56.1 Statements ("LR Statements"), this opinion cites to the LR Statements. However, Defendants' LR Statement, which is attached to Defendants' motion [dkt 57], is insufficient under Local Rule 56.1, with which this court requires strict compliance. *See Case Management Procedures, Summary Judgment Motions*, http://www.ilnd.uscourts.gov/JUDGE/BROWN/gsbpage.htm (accessed January 26, 2004). *See also Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002) (stating that "we have emphasized the importance of local rules and 'have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment'") (quotation omitted).
Local Rule 56.1(a)(3) requires a moving party to submit a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). Local Rule 56.1(a)(3) also indicates that the statement shall include "a description of the parties," and "all facts supporting venue and jurisdiction in this Court." L.R. 56.1(a)(3)(A), (B). Defendants not only failed to include these facts in their LR Statement, but they provided only facts that were relevant to their particular arguments. That is not what is intended in Local Rule 56.1(a)(3). Local Rule 56.1(a)(3) was put in place so the courts would not be required, when deciding a motion for summary judgment, to scour the record in search of undisputed facts. Local Rule Statements are intended to be "road maps" for the court, which "does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994). In this case, Defendants' LR Statement was not a road map for the court – it simply set forth twelve factual statements supporting Defendants' position. Consequently, the court was required to review the pleadings in order to determine the relevant facts and what facts were in dispute.
It should be added that if the court had considered Plaintiffs' purported cross-motion for summary judgment, the same comments would have been directed to Plaintiffs' LR Statement.

[5] Plaintiffs' Second Amended Class Action Complaint (the "Complaint"), which was filed on July 16, 2003, is cited as "Compl." [dkt 53], and Defendants' Answer to Plaintiffs' Second Amended Class Action Complaint is cited as "Answer." [Dkt 54.] Defendants' Local Rule Statement is cited as "Defs.' LR Stmt." Plaintiffs submitted one document [dkt 59],

wished to purchase a car and provided Soto with her social security number, income and address. (*Id.* ¶ 9.) Plaintiffs claim that Soto then pulled Leticia Nevarez's credit report and informed Leticia Nevarez that she was approved for $22,000 to $25,000 if she made a down payment of $3,000 to $5,000. (*Id.*)[6]

It is undisputed that on or about May 5, 2001, Plaintiffs met with Soto at O'Connor and began looking at the selection of cars. (*Id.* ¶ 10; Answer ¶¶ 10, 12.) Soto informed them that they did not qualify for a Tahoe, so the Plaintiffs selected a 1999 Mercury Mountaineer (the "Mountaineer"). (Compl. ¶ 12; Answer ¶ 12.) Plaintiffs allege that Soto went to talk to a manager and ultimately stated that "he could get them the price they wanted, and the best interest rate, and only Jesus Nevarez needed to sign the contract." (Compl. ¶ 13.) Defendants deny that allegation. (Answer ¶ 13.)

Plaintiffs claim that they "arranged to leave" a $5,000 down payment check but told Soto that checks were being deposited into the checking account and the $5,000 check would not clear for a few days. (Compl. ¶ 14.) According to Plaintiffs, Soto told them "not to worry" because no one at O'Connor would cash the check immediately. (*Id.*) Defendants deny those allegations. (Answer ¶14.) Jesus Nevarez signed a retail installment contract (the "May 5, 2001 contract"), which was

---

containing both Plaintiffs' Response to Defendants' Local Rule 56.1 Statement (cited as "Pls.' Resp. to Defs.' LR Stmt.") and Plaintiffs' Statement of Additional Material Facts and Plaintiffs' L.R. 56.1 Statement in Support of their Motion for Summary Judgment on Count II (cited as Pls.' Add'l Facts"). The exhibits attached to that document are cited as attached to Plaintiffs' LR Statement.

[6] Where no denial or admission by Defendants is cited, Defendants responded to the allegation by claiming that they lacked sufficient information upon which to form a belief as to the truth of the allegation. (Answer ¶ 9.)

-4-

written entirely in English. (Pls.' LR Stmt., Ex. 10.)[7] Plaintiffs claim, however, that their conversations with Soto and all of the negotiations surrounding the May 5, 2001 contract were conducted in Spanish. (Compl. ¶¶ 15, 16.) Defendants deny those allegations. (Answer ¶¶ 15, 16.) After Jesus Nevarez signed the May 5, 2001 contract, Plaintiffs left O'Connor with the Mountaineer. (Compl. ¶ 17; Answer ¶ 17.) The copy of the May 5, 2001 contract provided to the court does not bear any signature on behalf of O'Connor. (App. A.)[8]

Sometime before May 17, 2001, Soto contacted Leticia Nevarez and informed her that the check she had written on May 5, 2001 was returned "NSF." (Compl. ¶ 18; Answer ¶ 18.) Leticia Nevarez returned to O'Connor on May 17, 2001, and tendered another $5,000 check, which Soto accepted. (Compl. ¶¶ 19, 20; Answer ¶¶ 19, 20.) According to the parties, "[i]t appears" that O'Connor presented Plaintiffs' second $5,000 check to its bank for payment on May 18, 2001. (Compl. ¶ 21; Answer ¶ 21.)

Plaintiffs claim that, on either May 18th or 19th, Soto called Leticia Nevarez and told her that the financing on the May 5, 2001 contract was "not able to be sold to the bank, i.e. [as]signed to a third party lender." (Compl. ¶ 22.) Soto also allegedly told Leticia Nevarez that she and her husband would need to return to the dealership and sign a different contract and that Mr. Nevarez would need

<hr>

[7] Defendants disputed that allegation in their Answer to Plaintiffs' complaint; however, it is apparent from the May 5, 2001 contract itself that Jesus Nevarez did sign that contract and that the contract was written entirely in English. (Pls.' LR Stmt., Ex. 10, May 5, 2001 contract.)

[8] Although Plaintiffs attached a copy of the May 5, 2001 contract to their LR Statement as part of Exhibit 10, that copy is incomplete and various portions are illegible. On November 6, 2003, Plaintiffs' counsel was ordered to deliver a more legible and complete copy of the May 5, 2001 contract to chambers. [Dkt 66.] Counsel for Defendants actually delivered a more complete and legible copy to chambers, but they did not file it with the Clerk of the Court. Therefore, in order to make it part of the record in this case, that copy of the May 5, 2001 contract is attached to this opinion as Appendix A, and will be cited herein from this point forward as "App. A."

a co-signer. (*Id.* ¶ 23.) Defendants deny that allegation. (Answer ¶ 23.) Plaintiffs claim that, on May 19, 2001, they returned to O'Connor with their cousin, Juan Huerta, who was willing to serve as a co-signer. (Compl. ¶ 24.) But, when they arrived, Soto allegedly told Plaintiffs that he was able to get them financed through Evergreen and that Mr. Huerta would not need to co-sign, but they would need to provide an additional $3,000 for the down payment. (*Id.* ¶ 25.) Plaintiffs then signed a second retail installment contract (the "May 19, 2001 contract"), which was written entirely in English. (*Id.* ¶ 26; Pls.' LR Stmt., Ex. 10.) Plaintiffs claim that, like the negotiations surrounding the May 5, 2001 contract, the negotiations surrounding the May 19, 2001 contract were conducted entirely in Spanish. (Compl. ¶ 27.) Defendants deny that allegation. (Answer ¶ 27.)

On or about November 7, 2001, a representative from Evergreen contacted Leticia Nevarez via telephone. (Compl. ¶ 30; Answer ¶ 30.) According to Plaintiffs, the Evergreen representative told Leticia Nevarez that she did not have insurance for the Mountaineer. (Compl. ¶ 30.) Plaintiffs insist that "[a]t no time were [they] in default of their obligation to retain insurance for the . . . Mountaineer." (*Id.* ¶ 31.) Evergreen allegedly repossessed the Mountaineer on or about November 13, 2001. (*Id.*)

On November 17, 2001, Plaintiffs, through their counsel, sent a letter to O'Connor and Evergreen, which allegedly revoked acceptance of the Mountaineer and rescinded their contracts with O'Connor and Evergreen. (*Id.* ¶ 32.) Plaintiffs contend that their attorney also sent demand/notice letters to O'Connor and Evergreen in compliance with 815 Ill. Comp. Stat. 505/10a. (*Id.*) O'Connor and Evergreen did not make a counter-offer and stated that they did not violate any laws. (*Id.*; Answer at ¶ 32).

At all relevant times, Evergreen was the assignee of the May 19, 2001 retail installment

contract and is the holder of the consumer credit contract. (Compl. ¶ 33; Answer ¶ 33). Caryl O'Connor is the agent, President and Secretary of O'Connor, and the agent and Secretary of Evergreen. (Compl. ¶ 33; Answer ¶ 33.)

Plaintiffs assert seven counts.[9] Count I alleges that O'Connor violated the Truth in Lending Act. Count II alleges that O'Connor violated the written notice requirements of the Equal Credit Opportunity Act. Count III alleges that O'Connor and Evergreen violated Section 2N of the Illinois Consumer Fraud Act. Count IV alleges that O'Connor violated Section 2C of the Illinois Consumer Fraud Act. Count V alleges that O'Connor and Evergreen made certain misrepresentations and omissions in violation of the Illinois Consumer Fraud Act. Count VI alleges that O'Connor delivered the car in violation of the Illinois Consumer Fraud Act and Deceptive Business Practices Act. Count VII alleges that Evergreen wrongfully repossessed the Mountaineer

## LEGAL STANDARD

Summary judgment is proper when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Indiana Funeral Dirs. Ins. Trust v. Trustmark Ins. Corp.*, 347 F.3d 652, 654 (7th Cir. 2003). "Judgment as a matter of law is appropriate when a party 'fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.'" *Indiana Funeral Dirs.*, 347 F.3d at 654 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Indeed, if it is clear that a plaintiff will be unable to satisfy the legal

---

[9] Counts I, III, and IV are brought by Plaintiffs, individually, and on behalf of three separate and distinct classes. (Compl. ¶¶ 35-36, 63-64, 82-83.) However, no class has been certified in this case. Thus, this ruling only affects the rights of Plaintiffs, individually.

requirement necessary to establish its case, summary judgment is not only appropriate but required." *Id*.

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252. In determining whether a genuine issue of fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id*. at 255. However, the court "is not required to draw unreasonable inferences from the evidence." *St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir. 1997).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the opposing party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id*. at 324. The non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id*. It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which it relies. *Bombard v. Fort Wayne Newsps., Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## DISCUSSION

Defendants argue that they are entitled to summary judgment on Counts I and II and, if summary judgment is granted, the remaining state law claims (Counts III through VII) should be dismissed for lack of subject matter jurisdiction. The court finds: (1) Defendants are entitled to summary judgment on Count I; (2) Defendants are not entitled to summary judgment on Count II; and (3) Defendants' request to dismiss Counts III through VII is moot.

### I.     Defendants are entitled to summary judgment on Count I.

In Count I, Plaintiffs claim that O'Connor violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, because O'Connor failed to itemize accurately the amount financed on the May 19, 2001 contract. TILA and its implementing regulation ("Regulation Z"), 12 C.F.R. § 226.18, require, *inter alia*, that creditors or lenders provide a written itemization of the amount financed, including "each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(B)(iii).

It is undisputed that a fee for a Lyndon American service contract was included in the May 19, 2001 contract. (Compl. ¶ 47; Answer ¶ 47; Pls.' LR Stmt., Ex. 10.) According to Plaintiffs, however, the amount paid to Lyndon American under the service contract was not accurately disclosed. (Compl. ¶ 47.) Plaintiffs claim that, on the May 19, 2001 contract, O'Connor indicated that Lyndon American would be receiving payment in the amount of $1495.00 when, in fact, the

amount paid to Lyndon American was "less than that." (*Id.*)[10] According to Plaintiffs, O'Connor's profit recap sheet suggests that O'Connor was to retain more $200.00 of the $1495.00 price. (*Id.*; Pls.' LR Stmt., Ex. 13.) Plaintiffs further claim that, as a result of that inaccurate disclosure, they suffered "actual damages . . . because they were unable to make an informed decision about the true cost of the credit." (Compl. ¶ 49.)

Defendants argue that "[e]ven if Plaintiffs could establish facts to establish [a] violation of TILA and Regulation Z, O'Connor would still be entitled to summary judgment on [Count I]" because Plaintiffs "suffered no actual damages, and they further are not entitled to statutory damages." (Defs.' Mot. ¶ 3.) The court agrees.

### A.    *Plaintiffs are not entitled to statutory damages.*

The statutory damages available for a TILA violation are outlined in 15 U.S.C. § 1640(a), which provides in relevant part:

> In connection with the disclosures referred to in section 1638 of this title, a creditor shall have a liability determined under paragraph (2) [*i.e.,* statutory damages under § 1640(a)(2)] only for failing to comply with the requirements of section 1635 of this title or paragraph (2) (insofar as it requires a disclosure of the "amount financed"), (3), (4), (5), (6), or (9) of section 1638(a) of this title.

15 U.S.C. § 1640(a). In other words, "[t]he only part of § 1638(a)(2) that gives rise to a right to recover statutory damages under § 1640(a)(2) is that concerning disclosure of the 'amount financed.'" *Kent v. Celozzi-Ettleson Chevrolet, Inc., et al.,* No. 99 C 2868, 1999 WL 1021044 at *8

---

[10] In their response brief, Plaintiffs also claim that O'Connor failed to disclose that it was retaining $310.00 of the $495.00 paid to Lyndon American for gap insurance. (Pls.' Mem. Opp'n at 5-6.) However, in their Complaint, Plaintiffs only allege that O'Connor retained an amount paid to Lyndon American under a service contract – not for gap insurance. (Compl. ¶ 47.)

n. 2 (N.D. Ill. Nov. 3, 1999) (Kennelly, J.).

Here, the alleged violation of § 1638(a)(2) is not the failure to disclose the "amount financed," but the failure to itemize accurately the components of the amount financed. Therefore, Plaintiffs are not entitled to statutory damages.[11] *See e.g., Rugumbwa v. Betten Motor Sales*, 200 F.R.D. 358, 364 (W.D. Mich. 2001) (stating that "[s]tatutory damages are not available under § 1638 for failure to disclose the itemization of the amount financed").

### B. Plaintiffs cannot prove they suffered actual damages.

Rather than seeking statutory damages, Plaintiffs claim that they suffered "actual damages" as result of O'Connor's inaccurate disclosure. (Compl. ¶ 49.) In order to recover actual damages under TILA, a plaintiff must establish "a causal connection between the inaccurate disclosure and [her] injury by demonstrating that [s]he relied on the inaccurate disclosure and thereby was effectively prevented from obtaining better credit terms elsewhere." *Groth v. Rohr-ville Motors, Inc.*, No. 95 C 05429, 1997 WL 630189 at *4 (N.D. Ill Sept. 30, 1997) (Williams, J.) (quoting *Adiel v. Chase Fed. Sav. & Loan. Ass'n*, 630 F. Supp. 131, 133 (S.D. Fla. 1986)) (alterations in original). Specifically, Plaintiffs must demonstrate that: (1) they read the TILA disclosure statement; (2) they understood the charges being disclosed; (3) had the disclosure statement been accurate, they would have sought a different warranty or a lower price; and (4) they would have obtained another warranty or a lesser price. *Id.* (citing *Romaker v. Crossland Mortgage Corp.*, No. 94 C 3328, 1996 WL 254299 at *2 (N.D. Ill. May 10, 1996) (Grady, J.)). Here, Plaintiffs cannot prove actual damages

---

[11] At the hearing on Defendants' motion, counsel for Plaintiffs stated that they were not seeking statutory damages.

because they cannot show that they read or understood the disclosure.

It is readily apparent that the May 19, 2001 contract was written entirely in English. (Pls.' LR Stmt., Ex. 10.) Jesus Nevarez testified in his deposition that he does not understand, write or read English. (Defs.' LR Stmt., Ex. A, Jesus Nevarez Dep. at 14-15; Defs.' LR Stmt. ¶ 1.) Leticia Nevarez testified in her deposition that she cannot write in English and can only speak 10% or 15% of the English language (Defs.' LR Stmt., Ex. B, Leticia Nevarez Dep. at 6; Defs.' LR Stmt. ¶ 2); that she must have her brother interpret forms delivered from the State of Illinois relating to her beauty shop (Leticia Nevarez Dep. at 7-8); that she has trouble reading first grade books to her daughter, even after she took an English language class one and a half years ago (*id.* at 9-11); and that she can only read about ten percent of the English language (*id.* at 11). Significantly, Plaintiffs have presented no *evidence* that they actually read the May 19, 2001 contract or had it read to them at any time. In fact, Plaintiffs submitted to the court Leticia Nevarez's statement that "[t]he entirety of the retail installment contract was never translated for [her] or [her] husband." (Pls.' LR Stmt., Ex. 12, Certification of Leticia Nevarez ¶ 4) (emphasis added).[12]

Plaintiffs argue that "when the contract was translated for [them] . . . they finally learned that the proceeds of the service contract were not accurately disclosed." (Pl.'s Mem. Opp'n at 3). If that is the case, Plaintiffs did not have the contract translated for them until sometime during the course of this lawsuit. According to Plaintiffs, the amount retained by O'Connor was only disclosed on the

---

[12] Defendants correctly point out that Leticia Nevarez's certification states that it is sworn to under 28 U.S.C. § 1782, which is a law permitting district courts to order evidence produced for use in a foreign or international tribunal. (Cert. of Leticia Nevarez at 2.) The appropriate authority for certification under penalty of perjury is 28 U.S.C § 1746. However, regardless of whether the certification may be considered evidence supporting Plaintiffs' position, Leticia Nevarez's statements, even if unsworn, may constitute admissions. Fed. R. Evid. 801(d)(2).

dealership's profit-recap sheets, which are "internal documents" that "the customer never sees." (Pls.' Mem. Opp'n at 6.) Thus, Plaintiffs could only have learned that the amount paid to Lyndon American was incorrect after O'Connor's recap sheet was produced in discovery (which is presumably why the claim relating to the overstatement of Lyndon American's fee was pleaded in the Second Amended Class Action Complaint and not in the original complaint). In short, Plaintiffs could not have relied on a statement when they have presented no evidence that they ever were aware of that statement.

Plaintiffs further argue that since the inaccurate disclosure was an "omission," the fact that Plaintiffs cannot read English should not preclude liability under TILA. (Pls.' Mem. Opp'n at 3-6.) That argument, however, is not supported by any authority and is based on a mischaracterization of the disclosure as an "omission." The Complaint states:

> O'Connor disclosed on the retail installment contract that Lyndon American would be receiving payment for the service contract in the amount of $1495.00. However, *the amount paid to Lyndon American for the service contract was less than that.* O'Connor's profit recap sheet shows that the dealer was to retain over $200.00 of the $1495.00 "price."

(Compl. ¶ 47) (emphasis added). What Plaintiffs have alleged is not that an amount subject to financing was omitted but rather that the amount paid to Lyndon American (the disclosure required by § 1638(a)(2)(B)(iii)) was overstated.

Plaintiffs also point out that O'Connor failed to provide them with a Spanish copy of their retail installment contract as required by Illinois law. (Pls.' Mem. Opp'n at 3.) However, there is no such requirement under TILA. Plaintiffs claim that "O'Connor cannot violate one law and the[n] somehow claim that such a violation exculpates them from liability under another." (*Id.* at 6.) But,

even if O'Connor was required to provide Plaintiffs with a Spanish contract under Illinois law, its failure to do so is irrelevant in determining whether TILA was violated.

Because Plaintiffs cannot demonstrate that they either read the disclosure statement or that they understood the charges being disclosed, they cannot show that they relied on the inaccurate disclosure. *See, e.g.*, *Rugumbwa*, 200 F.R.D. at 364-65 (holding that a plaintiff could not prove actual damages under TILA because he did not understand English and therefore could not have relied on the disclosure statements). Accordingly, Plaintiffs cannot prove actual damages and Defendants are entitled to summary judgment on Count I.[13]

## II.    Defendants are not entitled to summary judgment on Count II.

In Count II, Plaintiffs claim that O'Connor violated the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, by failing to notify them in writing of the reasons why financing under the May 5, 2001 contract was rejected. (Compl. ¶¶ 57-59). The ECOA contains broad antidiscrimination provisions that make it "unlawful for any creditor to discriminate against any applicant with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). The ECOA also contains notice requirements, providing that an applicant for credit "against whom adverse action is taken" is entitled to a statement of reasons for such an action from the creditor. *Id.* § 1691(d). An aggrieved applicant may bring a civil action against "[a]ny creditor who fails to comply with any

---

[13] Defendants also argue, on a separate and independent ground, that Plaintiffs cannot prove actual damages because "they cannot show that they were prevented from getting better credit elsewhere." (Defs.' Mem. Supp. Mot. at 6.) However, it is unnecessary to reach a decision on that issue because, as set forth above, Defendants are entitled to summary judgment on Count I because Plaintiffs cannot prove the requisite detrimental reliance.

requirement imposed under [the ECOA]." *Id.* § 1691e(a). The ECOA delegated to the Federal

Reserve Board (FRB) the power to implement regulations in furtherance of carrying out the ECOA's

purpose. *Id.* § 1691b(a). These regulations, known as "Regulation B," are found under 12 C.F.R.

§§ 202.1-202.17 (2003).

Defendants do not dispute that § 1691(d) of the ECOA requires "creditors" to provide a

notification of the denial of credit and a statement of the reasons for such actions. (Defs.' Mem.

Supp. Mot. at 7.) Rather, Defendants argue that O'Connor is not a "creditor" as that term is defined

by the ECOA. (*Id.*)

The ECOA defines the term "creditor" as follows:

> any person who regularly extends, renews, or continues credit; any
> person who regularly arranges for the extension, renewal, or
> continuation of credit; or any assignee of an original creditor who
> participates in the decision to extend, renew, or continue credit.

15 U.S.C. § 1691a(e). Furthermore, the version of Regulation B in effect at the time of the

transaction in this case defined "creditor" as:

> a person who, in the ordinary course of business, regularly
> participates in the decision of whether or not to extend credit . . . .
> For purposes of §§ 202.4 [prohibiting discrimination in credit
> decisions] and 202.5(a) [prohibiting discouragement of applying for
> credit], the term also includes a person who, in the ordinary course of
> business, regularly refers applicants or prospective applicants to
> creditors, or selects or offers to select creditors to whom requests for
> credit may be made.

20 C.F.R. § 202.2(*l*) (Jan. 2001). Comment 2 to § 202.2(*l*), which is also known as an Official Staff

Interpretation of Regulation B, explains that:

> For certain purposes, the term *creditor* includes persons such as real
> estate brokers who do not participate in credit decisions but who
> regularly refer applicants to creditors or who select or offer to select

creditors to whom credit requests can be made. These persons must comply with § 202.4, the general rule prohibiting discrimination, and with § 202.5(a), on discouraging applications.

12 C.F.R. Pt. 202, Supp. I, Section 202.2(*l*) (Jan. 2001).[14]

Effective April 15, 2003, § 202.2(*l*) was revised in that the first sentence was changed to define creditor as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit." 12 C.F.R. § 202.2(*l*) (March 2003). The comment to this new definition states as follows:

> For certain purposes, the term *creditor* includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications.

12 C.F.R. Pt. 202, Supp. I, Section 202.2(*l*) (March 2003).[15] The FRB elaborated on this comment in a final rule amending Regulation B, as follows:

> Comment 2(l)-2 has been revised to clarify the type of creditors subject *only* to the general prohibitions against discrimination in §§ 202.4(a) and (b), respectively.
>
> Some industry commenters expressed concern that the clarification would include in the definition of creditor persons without discretion to decide whether credit will be extended. The Board recognizes that

---

[14] The FRB has authorized officials in the Division of Consumer and Community Affairs to issue official staff interpretations of regulations and, except in unusual circumstances, such interpretations are incorporated in an official commentary to the regulation. 12 C.F.R. Pt. 202, App. D.

[15] It should be noted that with the March 2003 revisions, the anti-discouragement provision changed from § 202.5(a) to § 202.4(b), although the anti-discrimination provision remained unchanged at § 202.4(a).

> in the credit application process persons may play a variety of roles, from accepting applications through extending or denying credit. *Comment 2(l)-2 is intended to clarify* that where the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may *merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit.* Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decision—for example, where the dealer does not participate in setting the terms of the credit or making the credit decision—the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B.

68 Fed. Reg. 13144, 13155 (March 18, 2003) (emphasis added).

Where Congress has expressly delegated to an agency the responsibility of articulating standards governing a particular area, the courts must accord the ensuing regulation substantial deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). Because the FRB has been given explicit authority to prescribe regulations to carry out the purpose of the ECOA, the court should give substantial deference to the interpretations of the FRB. *Roseman v. Premier Financial Services-East, L.P.*, No. Civ.A. 96-4669, 1997 WL 570919 at *3 n. 3 (E.D. Pa. Sept. 3, 1997) (Pollak, J.). Moreover, if an agency sets forth a new rule which clarifies an unsettled or confusing area of the law, that rule can be applied retroactively to the case at hand just as a judicial determination construing a statute can be applied to the case at hand. *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001). The courts give great deference to an agency's expressed intent as to whether its rule changes the law or merely clarifies it. *Id.* Here, the final rule amending Regulation B specifically states that Comment 2(*l*)-2 is "intended to clarify" the ECOA

-17-

definition of creditor. Thus, the comment to revised Regulation B and the final rule are to be afforded substantial deference and applied to this case, notwithstanding the fact that the events giving rise to this case preceded the issuance of the ruling.

The regulatory definitions and agency interpretations set out above differentiate between two types of "creditors" based on the extent of their role in the credit decision. The first class (described herein as "Referring Creditors") do not participate in the credit decision, but merely refer applications to third-party credit institutions. Members of that class are considered "creditors" in a limited sense and are subject only to the requirements set forth in §§202.4(a) and (b), which prohibit discrimination and discouraging applications. 12 C.F.R. §§ 202.4(a) and (b). The second class of creditors (described herein as "Participating Creditors"), on the other hand, accept applications, perform underwriting and actually participate in setting the terms of credit or making the credit decision. "Participating Creditors" are required to comply with all of the statutory requirements, including §202.4(d), which requires written notice of adverse action.[16]

The issue in this case is whether O'Connor was a "Referring Creditor" or a "Participating Creditor" at the time Plaintiffs were denied financing under the May 5, 2001 contract. (Compl. ¶ 22.) Defendants argue that O'Connor merely accepts credit applications and refers applications to

---

[16] A recent decision from the Eastern District of Missouri described the FRB's regulatory definition of "creditor" and the agency interpretation thereof (prior to the 2003 revisions) as creating "a continuum of participation in a credit decision . . . . At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act." *Bayard v. Behlmann Automotive Servs., Inc.*, 292 F. Supp. 2d 1181, 1186 (E.D. Mo. 2003). The court in *Bayard* concluded that the defendant car dealership's activities in that case reached a point on the continuum where it "participated in the decision of whether or not to extend credit." *Id.* The court also found that the same result was reached under Regulation B's new definition of "creditor" and the agency's new comment and explanation. *Id.* at 1187. However, while the court stated that the defendant did more than merely accept and refer the plaintiff's credit application to a third party, the court did not state what that additional activity was. *Id.*

various lending institutions. (Defs.' Mem. Supp. Mot. at 8; Defs.' LR Stmt. ¶ 9.) The evidence shows that O'Connor also selects which potential lenders would be interested in which contracts. (Pls.' Resp. to Defs.' LR Stmt. ¶ 10; Pls.' LR Stmt., Ex. 3 at 17.) If those actions were the extent of O'Connor's participation in credit decisions, O'Connor would appear to fall into the category of "Referring Creditors" who are not required to provide consumers with written notice of adverse action pursuant to § 202.4(d).[17]

However, there is evidence that O'Connor did more than just refer Jesus Nevarez's application to potential third-party lenders. In the May 5, 2001 contract, O'Connor is designated as the "Seller" and Jesus Nevarez is designated as the "Buyer." (App. A at 1.) The May 5, 2001 contract also provides:

> Seller hereby sells and Buyer or Buyers, jointly and severally, hereby purchase the following motor vehicle with accessories and equipment thereon *for the deferred payment price and on the terms set forth in this contract.* Buyer acknowledges delivery and acceptance of said motor vehicle in good condition. . . . This contract shall be *binding* upon and inure to the benefit of the parties, their heirs, personal representatives, successor and assigns.

(*Id.* at 1, 3) (emphasis added). The terms of the financing arrangement are set forth in the contract (*id.* at 1), and nowhere in the contract does it indicate that any entity other than O'Connor is the creditor for purposes of the transaction. (*Id.* at 1.) Although the May 5, 2001 contract provides that

---

[17] In *Payne v. Diepholz Ford Lincoln Mercury, Inc.*, No. 02 C 1329, 2004 WL 40631 at *4-5 (N.D. Ill. Jan. 5, 2004) (Lefkow, J.), a recent decision from this District, the court found that the defendant car dealership was a creditor as defined by the ECOA and was, therefore, required to provide the plaintiffs with a written notice of the reasons that their credit application was denied. The court in *Payne* did not address the revised commentary and interpretations of Regulation B, and two of the three cases relied upon by the court were decided prior to those revisions. 2004 WL 40631 at *4. However, the defendant in *Payne* negotiated the terms of financing for its customers and had discretion to set a higher interest rate. *Id.*

Jesus Nevarez should make payments at the offices of "Harris Bank Barrington, National Association/J-N (Assignee)," the contract requires that the payments be made "to the order of Seller," and the "Seller" was given a security interest in the vehicle. (*Id.*) Although there is a section on the second page of the contract whereby O'Connor could have assigned the contract to a third-party, that section was never completed.[18] (*Id.* at 4.) The terms of the May 5, 2001 contract are not set out as an "application" for credit; those terms appear to be a credit contract that O'Connor could have enforced against Plaintiffs.

Defendants submit the affidavit of O'Connor's General Sales Manager, Sean Galvin, stating that O'Connor "does not make any credit decisions on whether a third party extends credit to a customer" and "does not [itself] finance customer[s]." (Defs.' LR Stmt. ¶¶ 10-11; Defs.' LR Stmt., Ex. C, Aff. of Sean Galvin ¶ 4-5.) Defendants also state that "[n]owhere in the May 5, 2001 [contract] did O'Connor . . . promise to finance the [Plaintiffs'] vehicle purchase." (Defs.' Add'l Authority at 2.) However, the terms of the May 5, 2001 contract set out an agreement under which O'Connor was extending credit to Plaintiffs pursuant to the financing terms set forth in the contract. Thus, when O'Connor could not find another lender to whom it could assign the contract, presumably O'Connor could have financed the transaction itself. O'Connor, however, declined to finance the transaction and voided the contract on May 19, 2001.

Defendants claim that Plaintiffs cannot use the May 5, 2001 contract to establish liability for Defendants under ECOA because Plaintiffs breached the May 5, 2001 contract when the check they

---

[18] Plaintiffs point to several cases indicating that an initial creditor is still a creditor even if an assignment occurs virtually instantaneously. However, all of the cases cited by Plaintiffs address TILA – not the ECOA. Furthermore, it is unnecessary to address that issue since the May 5, 2001 contract was never assigned.

issued on May 5, 2001 was dishonored by TCF Bank on May 9, 2001. (Defs.' Add'l Authority at 3-4) (citing *Streit v. Fireside Chrysler-Plymouth, Inc.*, 697 F.2d 193 (7th Cir. 1983)). In *Streit*, the Seventh Circuit concluded that the plaintiff who never paid the balance of his down payment on the car he purchased could not make a claim against the dealership under TILA. *Id.* at 197. In this case, although Plaintiffs' May 5, 2001 check was dishonored by the Bank, O'Connor accepted another check from Plaintiffs on May 17, 2001 and presented that check to its bank on May 18, 2001 – prior to voiding the May 5, 2001 contract on May 19, 2001. Therefore, a jury could find that even if Plaintiffs breached the May 5, 2001 contract, O'Connor waived the breach and accepted substitute performance. *See Gmurzynska v. United Exposition Serv. Co., Inc.*, No. 86 C 8845, 1989 WL 27137 at *3 (N.D. Ill. Mar. 23, 1989) (Williams, J.) ("A party to the contract may waive a condition precedent to performance on his part . . . by conduct manifesting a continued recognition of the contract's existence after learning of the breach thereof, such as 'by continuing to accept performance of the contract and to have the benefits thereof.'") (quoting *Chicago College of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1343 (7th Cir. 1983)); *see also Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. 1st Dist. 1988) ("An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it.").

Defendants also point to other evidence in the record indicating the parties' understanding that O'Connor was not financing the transaction from May 5, 2001 to May 19, 2001, specifically, the Affidavit of Spot Delivery, which was signed by Jesus Nevarez on May 5, 2001. That affidavit states:

> I am taking possession of this vehicle *prior to approval from the finance institution.* I further understand that by taking possession of this vehicle I have agreed to [i]ts purchase at the price agreed upon by myself and the transferor [O'Connor] as shown below.
>
> I give [O'Connor] authorization to investigate my credit history and place the contract with the lender of their choosing. *I understand that if [O'Connor] is unable to obtain credit approval on my loan* within three business days, and if I am unable to obtain financing on my own within 24 hours after notification from [O'Connor] that my loan has been denied, *I will be required to bring the vehicle back to [O'Connor].*

(Pls.' Add'l Facts, Ex. 7, Aff. Spot Delivery) (emphasis added). That paragraph suggests that the purchase and possession of the Mountaineer were contingent upon the ability of O'Connor to obtain credit approval from a third-party lender. However, the Affidavit of Spot Delivery is at odds with the May 5, 2001 contract. Additionally, the Affidavit of Spot Delivery is incomplete. Except for Jesus Nevarez' signature and the earnest deposit amount, the rest of the affidavit, including the dealer's signature and the year, make, model and VIN for the vehicle, was left blank. (*Id.*)

Defendants claim that O'Connor "promised to deliver a vehicle to Plaintiffs, contingent upon a third party's financing of the vehicle." (Defs.' Add'l Authority at 2.) However, when Leticia Nevarez was asked: "Did Juan Soto ever explain [to you] that if [O'Connor] could not sell your contract to a bank within three days . . . they could have you return the vehicle?," she responded: "No." (Leticia Nevarez Dep. at 134-35.)

Defendants have not demonstrated that there is no genuine issue of fact as to whether O'Connor was functioning as a "Participating Creditor," subject to the requirements of § 202.4(d), from May 5, 2001 through May 19, 2001. For that reason, summary judgment on Count II is denied.

### III. Defendants' request to dismiss Counts III though VII is moot.

Defendants argue that, if counts I and II are dismissed, the remaining state law claims should be dismissed for lack of jurisdiction. (Defs.' Mem. Supp. Mot. at 9.) A district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c). As set forth above, however, Defendants are not entitled to summary judgement on Count II – Plaintiffs' ECOA claim. Thus, Defendants' request to dismiss the state law claims is moot.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on Counts I and II is GRANTED in part and DENIED in part. Summary judgment is granted on Count I but denied on Count II, and Defendants' request to dismiss Counts III through VII for lack of subject matter jurisdiction is moot.

IT IS SO ORDERED.

GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: February 5, 2004

See Case
File For
Exhibits