UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESUS and LETICIA NEVAREZ, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>O'CONNOR CHEVROLET, INC. and EVERGREEN FINANCE COMPANY,<br>Defendants. | Cause No. 02 C 3568<br><br>Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

Defendants O'Connor Chevrolet, Inc. ("O'Connor") and Evergreen Finance Company ("Evergreen") (collectively, "Defendants") move for summary judgment against Plaintiffs Jesus and Leticia Nevarez (collectively, "Plaintiffs") on Count II of the Second Amended Class Action Complaint. [Dkt 78.] Defendants also request dismissal of Counts III through VII if summary judgment is granted on Count II. Summary judgment was previously granted in favor of Defendants on Count I of the complaint and denied as to Count II. *Nevarez v. O'Connor Chevrolet, Inc.*, 303 F. Supp. 2d 927, 933-36 (N.D. Ill. Feb. 5, 2004) (Brown, M.J.). [Dkt 75.] The parties have consented to the jurisdiction of a Magistrate Judge. [Dkt 7, 8.] For the reasons set out below, Defendants' motion for summary judgment on Count II is again denied, and Defendants' request to dismiss Counts III through VII is moot.[1]

---

[1] This opinion refers to Defendants collectively, because both O'Connor and Evergreen moved for summary judgment on Count II and requested dismissal of Counts III through VII. However, since Count II was brought only against O'Connor, the summary judgment ruling is directed towards and affects only O'Connor.

## JURISDICTION

The court has original jurisdiction over Count II and supplemental jurisdiction over Counts III through VII. *See Nevarez*, 303 F. Supp. 2d at 929-30.

## FACTUAL BACKGROUND[2]

Jesus and Leticia Nevarez reside in Chicago, Illinois. (Pls.' LR Resp. ¶ 1.) O'Connor is a car dealership located in Alsip, Illinois. (Pls.' LR Resp. ¶ 2.) On approximately April 10, 2001, Leticia Nevarez contacted O'Connor via telephone in response to a Spanish-language advertisement she had seen, asked for a representative who spoke Spanish and was connected to Juan Soto ("Soto"). (2nd Am. Compl. ¶¶ 7-8 [dkt 53]; Pls.' LR Stmt. ¶ 3; Defs.' LR Resp. ¶ 7; Defs.' LR Ex. B, Leticia Nevarez Dep. at 33-37.) According to Leticia Nevarez, the advertisement stated that O'Connor financed everybody, no matter what kind of credit they had. (L. Nevarez Dep. at 35.)[3] During that conversation, Leticia Nevarez told Soto that she wished to purchase a car and provided Soto with her social security number, income and address. (2nd Am. Compl. ¶ 9; L. Nevarez Dep. at 37.) Soto accessed Leticia Nevarez's credit report during their conversation and informed Ms.

---

[2] The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pls.' LR Resp. ¶ ___" [dkt 89], "Defs.' LR Resp. ¶ ___" [dkt 93], and from the exhibits submitted with those statements or responses to those statements, which are cited herein as: "Pls.' LR Ex.___" [dkt 89] and "Defs.' LR Ex. ___" [dkt 78]. The facts recited are those relevant to the present motion for summary judgment. For additional discussion of the factual background of this case, *see Nevarez*, 303 F. Supp. 2d at 930-32.

[3] O'Connor admits to having prepared flyer advertisements stating "Recuerde, Nosotros Financiamos A Todos" ("Remember, we finance everyone"), "Nosotros le revisamos su creditor GRATIS" ("We review your credit for free"), and "Not able to be financed at another place? Here you can!" (Defs.' LR Resp. ¶¶ 4-6.) The actual Spanish advertisements do not contain the English translations that are stated here. (Defs.' LR Resp. ¶¶ 4-5.)

Nevarez that she was approved for $20,000 to $25,000 if she made a down payment of $3,000 to $5,000. (Pls.' LR Resp. ¶ 6; Defs.' LR Resp. ¶¶ 7, 8; L. Nevarez Dep. at 36-38.)

A few weeks later, in early May 2001, Plaintiffs met with Soto at O'Connor and began looking at the selection of cars. (Pls.' LR Resp. ¶ 6; L. Nevarez Dep. at 34, 40-42.) Soto informed Plaintiffs that they did not qualify for a Tahoe, so Plaintiffs selected a 1999 Mercury Mountaineer (the "Mountaineer"). (Pls.' LR Resp. ¶¶ 7, 8; L. Nevarez Dep. at 42-44.) Plaintiffs assert that Soto (or someone else from O'Connor) evaluated Ms. Nevarez's credit again while they were there, and then orally advised Ms. Nevarez that O'Connor could not finance her for the Mountaineer, either. (Pls.' LR Stmt. ¶ 9; Pls.' LR Resp. ¶ 7; L. Nevarez Dep. at 54-55.)

When Plaintiffs became upset over the news, Soto advised Leticia Nevarez that they might be able to obtain financing for the car if her husband applied, provided his credit report was sufficient. (L. Nevarez Dep. at 55-56.)[4] O'Connor admits for purposes of this motion that it examined Jesus Nevarez's credit report in connection with the Mountaineer transaction on May 4, 2001. (Defs.' LR Resp. ¶ 12.) After that review, Jesus Nevarez signed a retail installment contract for the purchase of the Mountaineer on May 5, 2001 (the "May 5, 2001 contract"). (Pls.' LR Resp. ¶ 8; Defs.' LR Resp. ¶¶ 12, 13; Defs.' LR Ex. C, May 5, 2001 Contract.) After signing the May 5, 2001 contract, Plaintiffs left O'Connor with the Mountaineer. (Defs.' LR Resp. ¶ 14.)[5]

---

[4] Specifically, Plaintiffs allege that Soto stated that "he could get them the price they wanted, and the best interest rate, and only Jesus Nevarez needed to sign the contract." (2nd Am. Compl. ¶ 13.) Defendants deny that allegation. (Answer 2nd Am. Compl. ¶ 13.)

[5] As mentioned above, the record indicates that O'Connor checked Jesus Nevarez's credit on May 4, 2001, but did not sign a contract with Mr. Nevarez until May 5, 2001. It is unclear from the record how this came about. Possibly, the parties executed the contract on the 5th when Plaintiffs visited the dealership, but Soto had checked Jesus Nevarez's credit the day before. In any event, it is not material to resolving the present motion.

In connection with Plaintiffs' attempt to purchase the Mountaineer, O'Connor, who regularly submits its customers' credit applications to financing institutions, submitted Jesus Nevarez's credit application to five financing companies: Nuvell, AmeriCredit, Onyx Acceptance, Household Automotive Finance, and Evergreen. (Pls.' LR Resp. ¶ 9; Defs.' LR Resp. ¶ 15.) On approximately May 7, 2001, three of the financing companies, Nuvell, AmeriCredit, and Onyx Acceptance, notified O'Connor that they had declined to extend Jesus Nevarez credit for the May 5, 2001 contract. (Pls.' LR Resp. ¶¶ 10-12; Defs.' LR Exs. E-G, Declination Notices.) Plaintiffs contend that Household Finance, however, conditionally approved the financing of the May 5, 2001 contract. (Pls.' LR Stmt. ¶ 17; Pls.' LR Resp. ¶ 13; Defs.' LR Ex. H, Household Finance Credit Determination.) Plaintiffs base their contention on the testimony of Rosann Cunningham, a senior credit officer with Household Finance, who testified at her deposition that Household would have purchased the deal if the May 5, 2001 contract had reflected certain terms. (Pls.' LR Resp. ¶ 13; Defs.' LR Resp. ¶ 24; Defs.' LR Ex. N, Rosann Cunningham Dep. at 6, 54-55; *see also* Household Finance Credit Determination.)[6] Defendants also asserted, initially, that Household Finance had conditionally approved the financing of the May 5, 2001 contract. *See* Defs.' LR Stmt. ¶¶ 13, 32. However, in their Response to Plaintiffs' Local Rule 56.1 Statement, filed after their own Local Rule 56.1 Statement had been filed, Defendants denied that Household Finance conditionally approved Mr. Nevarez's financing application. (Defs.' LR Resp. ¶¶ 17, 18.) Defendants disputed that point based

---

[6] Specifically, Ms. Cunningham testified that she would have approved the deal if it reflected: (1) monthly payments of $500.00, (2) a calendar of payments of 60 months or less, (3) a down payment of $5,000.00, and (4) mileage of less than 50,000 miles on the Mountaineer. (Pls.' LR Resp. ¶ 13; Defs.' LR Resp. ¶ 24; Cunningham Dep. at 54-55.) In addition, the Household Finance Credit Determination document appears to indicate that Household Finance would have required Leticia Nevarez as a co-borrower. (Household Finance Credit Determination; *see also* Cunningham Dep. at 27, 32-33, 37, 53.)

on Ms. Cunningham's testimony that she initially declined to finance Jesus Nevarez. (*Id.*; Cunningham Dep. at 6, 31-32, 35, 58-59.) However, Ms. Cunningham also testified that after she declined the application, Household Finance "conditional[ly] approv[ed]" the application for financing and held that offer open until June 5, 2001. (Cunningham Dep. at 36-38.) Ms. Cunningham stated that while she had declined the application on the morning of May 7, 2001, an "acceptance of a payment" was entered into Household's system a few hours later that day. (*Id.* at 35-38.)[7]

Plaintiffs claim that, on either May 18th or 19th, Soto called Leticia Nevarez and told her that the financing on the May 5, 2001 contract was "not able to be sold to the bank, *i.e.* [as]signed to a third party lender." (2nd Am. Compl. ¶ 22; Defs' LR Resp. ¶ 20; L. Nevarez Dep. at 80.) Soto advised her that the application had been rejected because they "did not earn enough and [] because [they] needed another signature." (Defs.' LR Resp. ¶ 21; L. Nevarez Dep. at 80, 135-36.) Soto then told Ms. Nevarez that her husband would need to return to the dealership to sign a different contract, and that Mr. Nevarez would need a co-signer. (Defs.' LR Resp. ¶ 21; L. Nevarez Dep. at 80-81, 136.) Defendants admit that Ms. Nevarez so testified, and fail to cite any evidence to the contrary. (Defs.' LR Resp. ¶ 21.)

On May 19, 2001, Plaintiffs returned to O'Connor with Ms. Nevarez's brother-in-law, Juan Huerta, who was willing to serve as a co-signer. (L. Nevarez Dep. at 81-83.) When they arrived,

---

[7] According to Ms. Cunningham, a "conditional approval" means that the lender agrees to finance up to a certain maximum payment, based on a certain monthly payment that the consumer must be able to pay. (Cunningham Dep. at 22-23.) Ms. Cunningham further explained that with a conditional approval, the dealership must still submit a "full structure" payment (*e.g.*, information regarding the specific deal, specific car, and specific amount financed), before the lender can provide final approval. (*Id.* at 23, 38.)

however, Soto allegedly told Plaintiffs that Mr. Huerta would not need to co-sign after all because he was able to get Plaintiffs financed through Evergreen, but they would need to provide an additional $3,000 for the down payment. (2nd Am. Compl. ¶ 25; L. Nevarez Dep. at 85, 88.) Plaintiffs then entered into a new retail installment contract (the "May 19, 2001 contract"), which was signed by both Leticia and Jesus Nevarez. (Defs.' LR Resp. ¶ 20; Pls.' LR Resp. ¶ 15; Defs.' LR Ex. J, May 19, 2001 Contract.) That contract was assigned to Evergreen, who remained the assignee of the May 19, 2001 retail installment contract and the holder of the consumer credit contract at all relevant times. (Defs.' LR Resp. ¶ 20; Pls.' LR Resp. ¶ 14; 2nd Am. Compl. ¶ 33; Answer 2nd Am. Compl. ¶ 33).[8] Defendants admit that the May 19, 2001 contract contained several different terms and at least one additional party which the May 5, 2001 contract did not have. (Defs.' LR Resp. ¶¶ 22-23.)

Plaintiffs assert that O'Connor never told them that the May 5, 2001 contract had been conditionally approved by Household Finance or that they had until June 5, 2001 to accept Household's offer. (Pls.' LR Stmt. ¶¶ 21, 25.) They assert that, instead, O'Connor simply terminated their May 5, 2001 contract when they could have obtained financing from Household Finance. (*Id.* ¶ 18.) Defendants deny that they failed to inform Plaintiffs of any conditional approval by Household Finance. (Defs.' LR Resp. ¶¶ 21, 25.)[9]

On or about November 7, 2001, a representative from Evergreen contacted Leticia Nevarez by telephone and allegedly told her that she did not have insurance for the Mountaineer. (2nd Am.

---

[8] Caryl O'Connor, who is the agent, President and Secretary of O'Connor, is also the agent and Secretary of Evergreen. (2nd Am. Compl. ¶ 33; Answer 2nd Am. Compl. ¶ 33.)

[9] Defendants' denial of this point is based on their position that Household Finance never conditionally approved the loan. *See* Defs.' LR Resp. ¶ 25.

Compl. ¶ 30.) Plaintiffs insist that they were never in default of their obligation to retain insurance for the Mountaineer. (*Id.* ¶ 31.) Evergreen allegedly repossessed the Mountaineer on or about November 13, 2001. (*Id.*) On November 17, 2001, Plaintiffs, through their counsel, allegedly revoked acceptance of the Mountaineer and rescinded their contract with O'Connor and Evergreen. (*Id.* ¶ 32.)

It is undisputed that O'Connor failed to provide Jesus Nevarez with a written statement of the reasons as to why his May 5, 2001 contract with O'Connor was terminated. (Defs.' LR Resp. ¶ 19.)[10] Although O'Connor does not dispute that it failed to provide Jesus Nevarez with a written statement of the reasons for the termination of the May 5, 2001 contract, it denies that O'Connor had a policy of not providing written notice to customers whose contracts were terminated. (*Id.* ¶ 26.)[11]

Plaintiffs asserted seven counts in their Second Amended Complaint.[12] Only Count II is at issue in this motion, which alleges that O'Connor violated the written notice requirements of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691.

---

[10] Defendants state that this point is undisputed only for purposes of this motion for summary judgment. (Defs.' LR Resp. ¶ 19.)

[11] However, Karen Zimmerman, a finance manager who was employed by O'Connor for a period of four months, testified that she did not provide written notices to customers whose contracts were terminated detailing the reasons for such terminations. (Defs.' LR Resp. ¶ 26; Pls.' LR Ex. 8, Karen Zimmerman Dep. at 11-12, 13-14, 45-49.)

[12] As mentioned above, Count I was previously dismissed on summary judgment. [Dkt 75.] Count III alleges that O'Connor and Evergreen violated Section 2N of the Illinois Consumer Fraud Act. Count IV alleges that O'Connor violated Section 2C of the Illinois Consumer Fraud Act. Count V alleges that O'Connor and Evergreen made certain misrepresentations and omissions in violation of the Illinois Consumer Fraud Act. Count VI alleges that O'Connor delivered the car in violation of the Illinois Consumer Fraud Act and Deceptive Business Practices Act. Count VII alleges that Evergreen wrongfully repossessed the Mountaineer. (2nd Am. Compl.)

## LEGAL STANDARD

The legal standards for summary judgment that were set out in the previous opinion are applied to the present motion. *See Nevarez*, 303 F. Supp. 2d at 932-33.

## DISCUSSION

In Count II, Plaintiffs claim that O'Connor violated the ECOA by failing to notify them in writing of the reasons why financing under the May 5, 2001 contract was rejected. (2nd Am. Compl. ¶¶ 57-59). The ECOA contains broad anti-discrimination provisions that make it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). The ECOA also contains notice requirements, providing that an applicant for credit "against whom adverse action is taken" is entitled to a statement of the specific reasons for such an action from the "creditor." *Id.* § 1691(d). An aggrieved applicant may bring a civil action against "[a]ny creditor who fails to comply with any requirement imposed under [the ECOA]." *Id.* § 1691e(a).

Defendants' renewed motion for summary judgment on Count II is based on two arguments: (1) that O'Connor is not a "creditor" as that term is defined by the ECOA; and (2) that even if O'Connor is a creditor, it was not required to send an adverse action notice because Plaintiffs accepted and used credit from Evergreen. (Defs.' Mot. ¶¶ 5-7, 12-14; Defs.' Mem. at 3-4, 5-6.)[13]

---

[13] Defendants asserted a third argument in their motion for summary judgment, as well, namely, that O'Connor was not required to send an adverse action notice because the three creditors who declined to finance the May 5, 2001 contract sent notices to them directly. (Defs.' Mot. ¶¶ 8-11; Defs.' Mem. at 4-5.) Defendants subsequently withdrew that argument. *See* Defs.' Reply at 2; Defs.' LR Resp. ¶ 1; *see also* Pls.' LR Ex. 1.

A.  **Whether O'Connor is a "creditor" under the notice provisions of ECOA.**

In a reprise of their argument on the previous motion for summary judgment, Defendants argue that O'Connor is not a "creditor" under ECOA. Defendants cite a subsequent decision by the Seventh Circuit in *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971 (7th Cir. 2004). However, the *Treadway* decision does not change this court's view that there are questions of fact as to whether O'Connor was a "creditor" in a manner that would create liability in these circumstances, and thus, summary judgment cannot be granted for Defendants on this basis.

As discussed in this court's previous opinion, the ECOA defines the term "creditor" as:

> any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

15 U.S.C. § 1691a(e). The ECOA delegated to the Federal Reserve Board (FRB) the power to implement regulations in furtherance of carrying out the ECOA's purpose. *Id.* § 1691b(a). These regulations, known as "Regulation B," are found under 12 C.F.R. §§ 202.1-202.17 (2003). The term "creditor" is also defined by Regulation B:

> Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. . . . For purposes of §§ 202.4(a) and (b) [prohibiting discrimination in credit decisions and discouragement from applying for credit], the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. . . .

12 C.F.R. § 202.2(*l*) (March 2003).[14] Comment 2 to § 202.2(*l*), which is also known as an Official

---

[14] Prior to April 15, 2003, Regulation B defined a "creditor" as "a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit." 12 C.F.R. § 202.2(*l*) (Jan. 2002). As the Seventh Circuit stated in *Treadway*, "[w]e do

Staff Interpretation of Regulation B, explains that:

> For certain purposes, the term *creditor* includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications.

12 C.F.R. Pt. 202, Supp. I, Section 202.2(*l*) (March 2003).[15] The FRB elaborated on this comment in a final rule amending Regulation B, as follows:

> Comment 2(*l*)-2 is intended to clarify that where the only role a person plays is accepting and referring applications for credit, or selecting creditors to whom applications will be made, the person meets the definition of creditor, but only for purposes of the prohibitions against discrimination and discouragement. For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit. Where the automobile dealer only accepts applications for credit and refers those applications to another creditor who makes the credit decision–for example, where the dealer does not participate in setting the terms of the credit or making the credit decision–the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B.

68 Fed. Reg. 13144, 13155 (March 18, 2003).

The *Treadway* court noted, "[T]here is 'a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some

---

not view the subsequent amendment as a substantive change in the regulation but merely as a clarification. . . . Therefore, retroactive application of the amended regulation is not prohibited." 362 F.3d at 979 n. 7.

[15] The FRB has authorized officials in the Division of Consumer and Community Affairs to issue official staff interpretations of regulations and, except in unusual circumstances, such interpretations are incorporated in an official commentary to the regulation. 12 C.F.R. Pt. 202, App. D.

point along the continuum, a party becomes a creditor for purposes of the notification requirements of the Act.'" 362 F.3d at 980 (quoting *Bayard v. Behlmann Automotive Servs., Inc.*, 292 F. Supp. 2d 1181, 1186 (E.D. Mo. 2003)). This court's previous opinion interpreted the regulatory definitions and agency interpretations as differentiating between two types of "creditors" based on the extent of their role in the credit decision: "referring creditors," who do not participate in the credit decision but merely refer applications to third-party credit institutions, and "participating creditors," who accept applications and actually participate in setting the terms of credit or making the credit decision. *Nevarez*, 303 F. Supp. 2d at 937-38. As discussed in the previous opinion, "referring creditors" are considered "creditors" in a limited sense and are subject only to the requirements set forth in §§ 202.4(a) and (b), which prohibit discrimination and discouraging applications. *Id.* at 938. "Participating creditors" are required to comply with all of the statutory requirements, including §202.4(d), which requires written notice of adverse action. *Id.*

In *Treadway*, the Seventh Circuit found that an automobile dealer was a "creditor" for purposes of the ECOA's notice requirement because, among other factors, the dealer had decided not to send an applicant's credit application to any lender. 362 F.3d at 980. Thus, the court held that the dealer "not only 'participate[d]' in the decision of whether to extend credit – it ma[de] the decision itself." *Id.* Defendants argue that *Treadway* supports a finding that O'Connor is *not* a creditor under ECOA's notice provisions because, unlike the dealer in *Treadway*, O'Connor merely sent Mr. Nevarez's applications to third party creditors who, in turn, made their own credit decisions. (Defs.' Mot. ¶ 14; Defs.' Mem. at 6.)

Plaintiffs, on the other hand, argue that the *Treadway* decision supports *their* position. They argue that, like the dealer in *Treadway*, O'Connor is a creditor under the notice provisions because

it "single-handedly decided to terminate Mr. Nevarez's May 5, 2001 contract, even though the contract was signed, Mr. Nevarez had already made the down payment, he received the vehicle contracted for, and the contract was enforceable." (Pls.' Resp. at 4-5.) Plaintiffs argue that, by doing so, O'Connor "effectively became the denier of credit," because, according to Plaintiffs, Mr. Nevarez could have obtained financing for the May 5, 2001 contract through Household Finance. (*Id.* at 5, 9) (citing *Treadway*, 362 F.3d at 975.)

The *Treadway* decision does not change the conclusion that summary judgment cannot be granted to Defendants. The *Treadway* decision does not hold that the fact that O'Connor sent Mr. Nevarez's application to third party lenders requires the conclusion that O'Connor was not a participating creditor. Rather, O'Connor has not demonstrated that a reasonable fact finder could not conclude that O'Connor may have "effectively bec[o]me the denier of credit" by deciding to terminate Mr. Nevarez's May 5, 2001 contract. Although it is disputed, there is some factual support in the record for Plaintiffs' position that Household Finance had "conditionally approved" Mr. Nevarez's contract for financing, and that O'Connor never conveyed any such approval to Mr. Nevarez. Although it is not clear on the present record, Plaintiffs may be able to demonstrate that "conditional approval" would have become actual financing for Mr. Nevarez's purchase.

In addition, Plaintiffs have also presented evidence to support their position that O'Connor acted as a "participating creditor" by "restructuring the terms of the sale in order to meet the concerns of the creditor . . . [by,] [f]or instance, . . . (a) insist[ing] on more money down; (b) request[ing] that the applicant find a cosigner; or (c) lower[ing] the price of the car," and "regularly set[ting] the [APR] associated with the sale," factors cited by the Seventh Circuit in finding that the dealership in *Treadway* was a creditor for purposes of the ECOA's notification requirements. 362

F.3d at 980. Plaintiffs cite the testimony of Sylvia Borchert, an employee of Nuvell (one of the financing companies who received Jesus Nevarez's credit application), that "the APR on the contract is . . . what the dealership puts on the contract" and Nuvell had "nothing to do with [that] rate." (Pls.' Resp. at 9) (citing Pls.' LR Ex. 11, Sylvia Borchert Dep. at 29.)

Regarding O'Connor's participation by "restructuring the terms of the sale," Plaintiffs have presented evidence that O'Connor suggested or required several changes in the applications that were submitted by Plaintiffs to meet the concerns of third party lenders. For example, on May 5, 2001, Soto advised Plaintiffs that Jesus would be a better candidate for credit than Leticia (even though it was Leticia who had intended to apply), and then on May 19, 2001, Soto advised Plaintiffs that they would be better candidates together. (Pls.' LR Resp. ¶ 8; Defs.' LR Resp. ¶ 13; L. Nevarez Dep. at 55-56, 85; May 5, 2001 Contract; May 19, 2001 Contract.) Soto also advised Plaintiffs that an additional down payment would be necessary (L. Nevarez Dep. at 88; May 19, 2001 Contract); and, at one point, advised them that they would need a co-signer to complete the deal. (Defs.' LR Resp. ¶ 21; L. Nevarez Dep. at 80-83, 135-36.) While it is not clear whether it was O'Connor or a third party lender who suggested these changes, there is evidence in the record indicting that it may have been O'Connor. *See, e.g.*, Defs.' LR Resp. ¶ 10 (O'Connor denied Leticia Nevarez credit on May 5, 2001 before submitting her credit application to any third party lender); Borchert Dep. at 29.

Finally, Plaintiffs also argue that O'Connor is a creditor under the notice provisions because O'Connor actually extended credit to Mr. Nevarez when he signed the May 5, 2001 contract and left with the Mountaineer. (Pls.' Resp. at 8.) Plaintiffs rely on a point made in this court's previous opinion, specifically, that nowhere in the May 5, 2001 contract does it indicate that any entity other than O'Connor is the creditor for purposes of the transaction. *See Nevarez*, 303 F. Supp. 2d at 939.

-13-

Accordingly, Defendants have not demonstrated that there is no genuine issue of fact as to whether O'Connor was functioning as a "participating creditor" subject to the requirements of § 202.4(d) in connection with the May 5, 2001 contract. Thus, summary judgment cannot be granted on that basis.

### B. Whether Plaintiffs' acceptance and use of credit from Evergreen eliminated any requirement that O'Connor send an adverse action notice.

A creditor is required to notify an applicant in writing of an adverse action on an application or existing account. 12 C.F.R. §§ 202.9(a)(1)(i), (iii); (a)(2). However, "[w]hen an application is made on behalf of an applicant to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification of action taken by any of the other creditors is not required." 12 C.F.R. § 202.9(g). Defendants argue that, even if O'Connor is deemed a "participating creditor" subject to the notification obligation, it was not required to send an adverse action notice to Jesus Nevarez because Plaintiffs expressly used and accepted credit extended by Evergreen, one of the five creditors to whom O'Connor submitted the credit applications. (Defs.' Mem. at 3-4.)

Plaintiffs acknowledge that they accepted credit offered by one of the creditors (Evergreen), but contend that their acceptance pertained to the *second* contract they signed, namely, the May 19, 2001 contract. *See* Pls.' Resp. at 10-11. Plaintiffs argue that there were two separate, binding transactions – the May 5, 2001 contract and the May 19, 2001 contract – and that the May 5, 2001 contract was unilaterally terminated by O'Connor, which Plaintiffs claim was an adverse action requiring O'Connor to send a notice. *Id.* Plaintiffs argue that the exception set out in 12 C.F.R. 202(9)(g) contemplates only one binding contract being formed, not one contract being terminated and another new contract being created as a replacement. (Pls.' Resp. at 11.) However, Plaintiffs

-14-

acknowledge, in response to a direct question posed by the court, that "there is no specific law or commentary either supporting or rejecting" their argument. (Pls.' Submission Pts. at 4.) [Dkt 97.]

Defendants cannot be liable under the ECOA unless the Plaintiffs were subjected to an adverse action without notification. There are definitions of "adverse action" in Regulation B, but they include exceptions that create issues in this case. The regulations state that an adverse action includes "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application *unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered.*" 12 C.F.R. § 202.2(c)(1)(i) (emphasis added). An adverse action also includes "[a] termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts." *Id.* § 202.2(c)(1)(ii). However, if the change in the terms of the account is "expressly agreed to by an applicant," there is no adverse action requiring notification. *Id.* § 202.2(c)(2)(i).

Applying the regulations in this case raises the questions of whether the statements made by Soto which ultimately led to the May 19, 2001 contract constituted a "counteroffer" that was accepted by Plaintiffs, or whether the execution of the May 19, 2001 contract constituted a "change in the terms of an account expressly agreed to by an applicant." *Id.* §§ 202.2(c)(1)(i), (ii); (c)(2)(i). If there was a counteroffer that was accepted by Plaintiffs or a change in the terms of an account to which Plaintiffs expressly agreed, then there was no adverse action requiring notification.[16]

---

[16] Plaintiffs argue in two footnotes that O'Connor was also required to give Leticia Nevarez an adverse action notice when it denied her credit on May 5, 2001. (Pls.' Resp. at 4 n. 11, 11 n. 37.) However, Plaintiffs' Second Amended Complaint does not allege that Defendants violated the ECOA by failing to provide an adverse action notice with respect to the denial of credit to Leticia Nevarez. *See* 2nd Am. Compl. ¶¶ 51-61. The court will not consider claims made only in footnotes.

1.   **Counteroffer**

Defendants argue that there was no adverse action because Plaintiffs' "initial application for credit [wa]s declined but coupled with a counteroffer with different terms, which [Plaintiffs] accept[ed]." (Defs.' Resp. Questions at 3-4.) [Dkt 96.] Defendants rely on 12 C.F.R. § 202.2(c)(1)(i), quoted above.

While at first glance it might seem that the statements made by Soto which ultimately led to the May 19, 2001 contract constituted a counteroffer, a closer look reveals that that is not necessarily the case. If a contract was formed by the parties on May 5, 2001, then Jesus Nevarez's "application" for credit would no longer be pending, and O'Connor would not be in a position to make a "counteroffer." Thus, whether O'Connor made a counteroffer depends on whether O'Connor accepted Jesus Nevarez's May 5, 2001 application for credit and the parties entered into a binding contract. Plaintiffs argue that by allowing Mr. Nevarez to leave with the Mountaineer after he signed the contract, O'Connor provided a "'notice' of acceptance." (Pls.' Submission Pts. at 3.) As discussed in the previous opinion, the record presented by the parties does not eliminate questions of fact as to whether the May 5, 2001 contract was a binding contract or merely an application.[17] On

---

[17] That opinion observed:

> The terms of the May 5, 2001 contract are not set out as an "application" for credit; those terms appear to be a credit contract that O'Connor could have enforced against Plaintiffs. . . . [T]he terms of the May 5, 2001 contract set out an agreement under which O'Connor was extending credit to Plaintiffs pursuant to the financing terms set forth in the contract. Thus, when O'Connor could not find another lender to whom it could assign the contract, presumably O'Connor could have financed the transaction itself. O'Connor, however, declined to finance the transaction and voided the contract on May 19, 2001.

*Nevarez*, 303 F. Supp. 2d at 940. On the other hand, although the May 5, 2001 contract was signed by Jesus Nevarez, it was never signed by anyone at O'Connor. Additionally, the Affidavit of Spot Delivery (which was also signed by Jesus Nevarez) stated that if O'Connor was unable to

the present motion there is also the disputed evidence of the alleged Household Finance conditional approval. If Household Finance approved the loan and accepted Mr. Nevarez's application, O'Connor could not have made a counteroffer, because the deal would have been complete. In short, Defendants have not demonstrated that there is no question of fact as to whether Plaintiffs accepted a counteroffer to grant credit on different terms.[18]

### 2. Change in the terms of an account

Finally, Defendants argue that there was no adverse action for a second reason, relying on 12 C.F.R. § 202.2(c)(2)(i), mentioned above, which states that the term "adverse action" does not include "[a] change in the terms of an account expressly agreed to by an applicant." Defendants point to regulations defining an "account" as "an extension of credit," and an "extension of credit" as "the granting of credit in any form. . . ." 12 C.F.R. § 202.2(q). Defendants then argue that by retaining the Mountaineer without tendering full payment for it, Plaintiffs maintained a credit "account" with O'Connor, and that because Plaintiffs ultimately accepted credit extended to them by Evergreen, there was never any "termination of an account" pursuant to 12 C.F.R. § 202.2(c)(1)(ii). (Defs.' Reply at 3-5.)[19] According to Defendants, the changes between the May 5,

---

obtain credit approval on the loan within three business days and Jesus Nevarez was unable to obtain financing on his own, he would be required to return the vehicle, which is at odds with viewing the May 5, 2001 contract as a binding contract to extend credit. *Id.* at 940-41.

[18] Defendants cite *Davis v. U.S. Bancorp*, 383 F.3d 761, 767 (8th Cir. 2004) and *Diaz v. Virginia Housing Dev. Auth.*, 117 F. Supp. 2d 500, 505 (E.D. Va. 2000) in support of their argument that a counteroffer was made. (Defs.' Resp. Questions at 3-4.) However, in both of those cases, the creditor made a counteroffer on an *application* that was pending. Here, in contrast, the court has not found that the May 5, 2001 contract was only an application.

[19] For this argument, Defendants assume, *arguendo*, that O'Connor is a "participating creditor." (Defs.' Reply at 3.)

-17-

2001 contract and May 19, 2001 contract did not require an adverse action notification based on an unfavorable "change in the terms of an account," because those changes were "expressly and knowingly agreed to by the plaintiffs." (Defs.' Reply at 4-5.)

The parties essentially agree (at least *arguendo*) that an "account" was created on May 5, 2001 when Jesus Nevarez signed the May 5, 2001 contract and Plaintiffs left with the car. *See id.* at 3; Pls.' Submission Pts. at 3. In addition, there is no question that Plaintiffs expressly agreed to different terms in the May 19, 2001 contract.[20] However, Plaintiffs argue that the May 5, 2001 account was terminated before the May 19, 2001 contract was ever formed and, thus, they could not have agreed to any changes in that account. (Pls.' Submission Pts. at 3.) If the May 5, 2001 account was terminated, the new terms of the May 19, 2001 contract would not be "changes" to the account, but, instead, would be terms of a completely new account.

Defendants respond that even if the May 5, 2001 contract was terminated or voided, that termination did not result in the termination of the *account* or extension of credit to Plaintiffs because Plaintiffs continually had possession of the Mercury Mountaineer without tendering full payment for it. (Defs.' Reply at 3-4.) Thus, Defendants argue, Plaintiffs maintained a credit *account* under the ECOA, whether or not the May 5, 2001 *contract* was ever terminated or voided. (*Id.*)[21]

---

[20] Plaintiffs argue that they were "deceived" into signing the May 19, 2001 contract, based on their contention that they were conditionally approved for financing from Household Finance and thus should not have had to sign a new contract. (Pls.' Resp. at 3, 9-10, 12-13; Pls.' Submission Pts. at 6.) In addition to the factual dispute about whether Household Finance actually approved Plaintiffs, Plaintiffs have not demonstrated that their argument (effectively a suggestion of fraud) is relevant to the present issue.

[21] In response, Plaintiffs' counsel stated at oral argument that Plaintiffs only kept the car after the May 5, 2001 contract was voided because O'Connor did not return their down payment to them. However, the situation is not so simple. The original check that Plaintiffs had given O'Connor on May 5 was returned "NSF," and Leticia Nevarez returned to O'Connor on May 17, 2001 with a second down payment check. *See Nevarez*, 303 F. Supp. 2d at 931. According to

-18-

Although Defendants argue that there is a "distinction between a contract and an 'account'" under the ECOA (*id.* at 3), they have not provided authority (except for their own interpretation of the regulations) to support that argument. Defendants do not explain how a credit account can exist in the absence of a contract between the parties pursuant to which the credit is extended. In addition, the contract that Plaintiffs signed on May 19, 2001 contained not only new terms, such as a higher down payment and an additional co-signer (Leticia Nevarez), but also a different creditor (Evergreen). Thus, the parties on both sides of the contract changed. Furthermore, Defendants make no effort to reconcile their current position with the Affidavit of Spot Delivery, the document that authorized Jesus Nevarez to take the vehicle. That Affidavit provided that Plaintiffs must return the vehicle if O'Connor was unable to obtain credit approval for Mr. Nevarez's loan or he was unable to get financing on his own. *See Nevarez* 303 F. Supp. 2d at 940-41.

In short, Defendants have not demonstrated that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law under their theory that no notification was required because there was an existing account that never terminated. Thus, summary judgment cannot be granted on that basis, either.

## II. Defendants' request to dismiss Counts III though VII is moot.

Defendants argue that, if Count II is dismissed, the remaining state law claims should be dismissed for lack of jurisdiction. (Defs.' Mem. at 7-8.) Because Defendants are not entitled to summary judgement on Count II, Defendants' request to dismiss the state law claims is moot.

---

Plaintiffs, O'Connor deposited that check on May 18, and either that day or the following day were advised that Mr. Nevarez's financing had been rejected. (2nd Am. Compl. ¶¶ 56-57.)

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on Count II is denied, and Defendants' request to dismiss Counts III through VII for lack of subject matter jurisdiction is moot.

IT IS SO ORDERED.

GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: March 21, 2005