| | |
|---|---|
| **JESUS and LETICIA NEVAREZ,** ) | |
| **on behalf of themselves and all others** ) | |
| **similarly situated,** ) | |
| **Plaintiffs,** ) | **Case No. 02 C 3568** |
| ) | |
| ) | **Magistrate Judge Geraldine Soat Brown** |
| ) | |
| **O'CONNOR CHEVROLET, INC.** ) | |
| **and EVERGREEN FINANCE** ) | |
| **COMPANY,** ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Defendants O'Connor Chevrolet, Inc. ("O'Connor") and Evergreen Finance Company

("Evergreen") (collectively, "Defendants") move for summary judgment against Plaintiffs Jesus and

Leticia Nevarez (collectively, "Plaintiffs" or "the Nevarezes") on Counts V and VII of the Second

Amended Class Action Complaint. [Dkt 103.][1] Count V alleges that O'Connor and Evergreen made

certain misrepresentations and omissions in violation of the Illinois Consumer Fraud Act, and Count

VII alleges that Evergreen wrongfully repossessed the vehicle that Plaintiffs had purchased. (Third

Am. Compl. ¶¶ 105-14; 126-33.)[2] The parties have consented to the jurisdiction of a Magistrate

---

[1] In their motion, Defendants moved for summary judgment on two additional counts, Counts IV and VI, as well, but Plaintiffs subsequently moved to voluntarily dismiss those counts. [Dkt 115.] The court granted Plaintiffs leave to amend their complaint [dkt 119], and Plaintiffs filed a Third Amended Complaint omitting Counts IV and VI. (*See* Pls.' Third Am. Compl. [Dkt 120.] Thus, although Defendants' motion requested summary judgment on Counts IV - VII, only Counts V and VII are at issue here.

[2] In addition to Counts IV - VII, Plaintiffs' Second Amended Complaint alleged three more counts, or seven counts total. Summary judgment was previously granted in favor of Defendants on Count I and denied as to Count II. *See Nevarez v. O'Connor Chevrolet, Inc.*, 303

Judge. [Dkt 7, 8.] For the reasons set out below, Defendants' motion for summary judgment on Counts V and VII is granted.[3]

## FACTUAL BACKGROUND[4]

Jesus and Leticia Nevarez reside in Chicago, Illinois. (Pls.' LR Resp. ¶ 1.) O'Connor is a car dealership located in Alsip, Illinois. (Pls.' LR Resp. ¶ 2.) Evergreen is a finance company that finances automobiles. (Pls.' LR Ex. 9, Oct. 22, 2002 Robert Tomczak Dep. ("10/22/02 Tomczak Dep.") at 5.) Caryl O'Connor, O'Connor's owner, works in the same building as Evergreen and has an interest in Evergreen, and approves all of Evergreen's financing deals. (Defs.' LR Resp. ¶¶ 12, 19.) As of October 2002, Evergreen had financing arrangements with two dealerships, one of which was O'Connor and the other which appears to be owned by Caryl O'Connor. (10/22/02 Tomczak Dep. at 18-19; Pls.' LR Ex. 10, Oct. 17, 2003 Robert Tomczak Dep. ("10/17/02 Tomczak Dep.") at 27-28.)

---

F. Supp. 2d 927, 936, 940 (N.D. Ill. 2004); *Nevarez v. O'Connor Chevrolet, Inc.*, No. 02 C 3568, 2005 WL 675824 at *1 (N.D. Ill. March 21, 2005) (Brown, M.J.)). [Dkt 75, 100, 101.] Count III, which has not been the subject of a motion for summary judgment, alleges that Defendants violated Section 2N of the Illinois Consumer Fraud Act.

[3] This opinion refers to Defendants collectively, because both O'Connor and Evergreen moved for summary judgment on Counts V and VII. However, Count VII was brought only against Evergreen (whereas Count V was brought against both Defendants); thus, the summary judgment ruling with respect to Count VII is directed towards and affects only Evergreen.

[4] The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pls.' LR Resp. ¶ ___" [dkt 118], "Defs.' LR Resp. ¶ ___" [dkt 125], and from the exhibits submitted with those statements or responses to those statements, which are cited herein as: "Pls.' LR Ex.___" [dkt 118] and "Defs.' LR Ex. ___" [dkt 103]. The facts recited are those relevant to the present motion for summary judgment. For additional discussion of the factual background of this case, *see Nevarez*, 303 F. Supp. 2d at 930-32; *Nevarez*, 2005 WL 675824 at *1-3.

On approximately April 10, 2001, the Nevarezes called O'Connor in response to a Spanish language advertisement Ms. Nevarez had seen. (Defs.' LR Resp. ¶ 1; *Nevarez*, 2005 WL 675824 at *1.) The advertisement stated that O'Connor spoke Spanish and financed everyone, no matter what kind of credit they had. (Defs.' LR Resp. ¶ 1.) The advertisement also stated that consumers should call and ask for Juan Soto. (Pls.' LR Ex. 2; *see* Defs.' LR Resp. ¶ 1.)

A few weeks after that telephone conversation, in early May 2001, Plaintiffs met with Soto at O'Connor and began looking at the selection of cars. (Defs.' LR Ex. B, Leticia Nevarez Dep. at 34, 38, 40-42.)[5] Plaintiffs ultimately decided that they wanted to purchase a 1999 Mercury Mountaineer (the "Mountaineer"). (Pls.' LR Resp. ¶ 7.) Mr. Nevarez signed a retail installment contract for the purchase of the Mountaineer on May 5, 2001 (the "May 5 contract"). (Pls.' LR Resp. ¶ 8; Defs.' LR Ex. C.) The May 5 contract set forth the financing terms pertaining to the purchase of the vehicle, *e.g.*, the APR, finance charges, amount financed, total number of payments, and total sale price. (Pls.' LR Resp. ¶ 24.) The Nevarezes provided a check in the amount of $5,000 to O'Connor as the down payment for the purchase of the car that day. (Pls.' LR Resp. ¶ 10.)

Some time thereafter, the Nevarezes' down payment check was returned for insufficient funds. (Pls.' LR Resp. ¶ 10.) In addition, the Nevarezes were subsequently told that the financing on the May 5 contract was not able to be sold to a bank, *i.e.*, assigned to a third party lender. *See Nevarez*, 2005 WL 675824 at *2 and citations contained therein. They were advised to return to the dealership with a co-signer to sign a different contract. *See id.*

---

[5] Although Plaintiffs assert that O'Connor "appointed" Soto to "assume the role of translator for Jesus and Leticia Nevarez" (Pls.' LR Stmt. ¶ 3), the evidence cited supports the conclusion that Soto was the sales representative who worked with the Nevarezes and translated some things for them, not necessarily that he was "appointed" to serve as their translator. (Defs.' LR Ex. B at 67, 83-84.)

Plaintiffs assert that Household Finance would have financed the May 5 contract if it reflected: (1) monthly payments of $500, (2) a calendar of payments of 60 months or less, (3) a down payment of $5,000, and (4) mileage of less than 50,000 miles on the Mountaineer. (Pls.' LR Stmt. ¶ 7 (citing Pls.' LR Ex. 4, Rosann Cunningham Dep. at 54).) Those terms, Plaintiffs claim, were "terms closely approximating" the terms in the May 5 contract. (Pls.' LR Stmt. ¶ 8.) O'Connor does not dispute that it never advised the Nevarezes that Household Finance had approved a loan with those terms, but Defendants deny that Household ever approved such a loan. (Defs.' LR Resp. ¶ 8.) They also deny that such terms closely approximated the terms of the May 5 contract. (*Id.*) Rosann Cunningham, a senior credit officer with Household Finance, testified that Household would *not* have purchased the May 5 contract because it called for 66 payments, and the maximum number of payments Household would have allowed was 60. (Cunningham Dep. at 58-59.) She also testified that Household issued a "conditional approval" for a deal based on the alternative terms listed above, but the deal could still be declined for "structure" reasons (*e.g.*, information regarding the specific deal, car, and amount financed). (*Id.* at 23-24, 38, 54-59, 63-66); *see also Nevarez*, 2005 WL 675824 at *2 n. 6, 7.

On May 19, 2001, the Nevarezes returned to O'Connor and signed a second retail installment contract for the purchase of the Mountaineer (the "May 19 contract"). (Pls.' LR Resp. ¶ 9; Defs.' LR Ex. D.) They were accompanied that day by Juan Huerta, Ms. Nevarez's brother-in-law, who was willing to serve as a co-signer. *See Nevarez*, 2005 WL 675824 at *3 and citations contained therein. Before signing the contract, however, the Nevarezes were told that Mr. Huerta would not need to co-sign after all because they could obtain financing through Evergreen, provided they pay an additional $3,000 as a down payment. *See id.*

O'Connor did not advise the Nevarezes about a document O'Connor had received from another potential creditor, Banco Popular. (Defs.' LR Resp. ¶ 9.) That document lists the applicant as Mr. Huerta and states, "Adverse Action Reasons: collateral not sufficient." (Pls.' LR Resp. Ex. 5, "Banco Popular Notification.") But it also appears to suggest that Mr. Huerta might have been approved for financing on different terms than those stated in the May 5 contract. It states, "Approval: $15000 x 60 11.99% MAX PYMT OF DEAL $375. Conditions: additional down payment." (Id.) Although Defendants assert that they learned of the Banco Popular notification after the Nevarezes signed May 19 contract (Defs.' LR Resp. ¶ 9), the Banco Popular Notification bears a fax date of May 19, 2001, the same day that Plaintiffs signed the second contract (see Banco Popular Notification). The court will assume that Defendants were aware of the Banco Popular Notification at the time that the Nevarezes signed the May 19 contract.

Plaintiffs claim that there was a third potential source of financing, Harris Bank, which sent a credit decision to O'Connor. (See Pl.'s LR Ex. 6, "Harris Bank Decision"). That document approves Mr. Huerta for an amount financed of $16,300 at 7.45%, with a payment term of 60 months, and a cash down payment of $8,000. (Id.) Defendants deny that they had received the Harris credit decision before the May 19 contract was signed. (Defs.' LR Resp. ¶ 10.) The credit decision bears a fax date of May 21, 2001. (See Harris Bank Decision.) Plaintiffs have presented no evidence to the contrary.

The May 19 contract signed by the Nevarezes changed the credit terms of the May 5 contract. (Defs.' LR Resp. ¶ 6.) For example, the May 19 contract required an additional $3,000 as a down payment. (Id.) It also required $495 for GAP insurance, which increased the monthly payment on the vehicle, and included a wage assignment provision. (Id.) In addition, the May 19 contract had

an APR of 20.95%, which was a slight increase over the 20.90% APR in the May 5 contract. (Pls.' LR Resp. ¶¶ 17, 18.)

The May 19 contract was assigned to Evergreen to provide financing to the Nevarezes for the purchase of the Mountaineer.[6] (Pls.' LR Resp. ¶¶ 9, 27; Defs.' LR Resp. ¶ 12.) Mr. Nevarez signed an affidavit of spot delivery stating that he "underst[ood] that [he] [wa]s taking possession of this vehicle prior to approval from the finance institution" and that he may have to return the vehicle if the purchase could not be financed. (Pls.' LR Resp. ¶¶ 21, 22.) O'Connor did not provide Mr. Nevarez with a written statement as to the reasons why he was not extended credit on the terms set forth in the May 5 contract. (Defs.' LR Resp. ¶ 5.) Nor did O'Connor provide the Nevarezes with a copy of the May 19 contract in Spanish. (*Id.* ¶ 16.)

The May 19 contract, like the May 5 contract, included a charge of $1,495 for a Lyndon American service contract, and a documentary fee of $50.48, which was apparently for the handling of documents and performance of services relating to the closing of the sale. (Pls.' LR Resp. ¶¶ 14, 16.) Although the service contract showed a charge of $1,495, only $1,259 of that amount was paid to "others." (Defs.' LR Resp. ¶ 14; Pls.' LR Ex. 8.) Ms. Nevarez testified that she recalled discussing the service contract with Soto, and that Soto told the Nevarezes how much the service contract would cost, although she could not recall what amount he stated. (Leticia Nevarez Dep. at 74.) She believed that her husband purchased the contract. (*Id.*) She admitted that she and her husband used the service provided under the contract within a week of purchasing it. (*Id.*)

Ms. Nevarez stated in an affidavit that she would not have agreed to pay for the service contract had she known that some of the money paid would have gone to O'Connor rather than the

---

[6] Evergreen lists the customer as Jesus Nevarez and states that he has a co-buyer or co-signer. (Pls.' LR Ex. 1.)

service contract provider, and that she would have tried to negotiate a lower price for the service contract. (Pls.' LR Ex. 7, Leticia Nevarez Decl. ¶ 6.) She also testified that she would not have signed the contract had she known it contained a wage assignment provision. (Leticia Nevarez Dep. at 141-42.) In addition, she testified that knowing that other companies besides Evergreen may have financed her husband's or Mr. Huerta's application was a material fact to her. (Pls.' LR Stmt. ¶ 11; Leticia Nevarez Dep. at 140-41.)

The May 19 contract contained a provision stating that the failure to maintain insurance on the vehicle would constitute a default under the contract, allowing the holder to take immediate possession of the vehicle. (Pls.' LR Resp. ¶ 26.)[7] The Nevarezes' insurance policy on the vehicle was set to expire on December 5, 2001. (Defs.' LR Resp. ¶ 20.) Evergreen, the assignee of the May 19 contract, maintained an account ledger with an entry for the Nevarezes' purchase that stated "Auto Ins Good 6/5/01-11/5/01." (Pls.' LR Ex. 1, 6/6/01 entry.)[8] On November 6, 2001, an Evergreen representative called Magnum Insurance to inquire about the Nevarezes' insurance coverage. (Defs.' LR Resp. ¶ 22; Pls.' LR Ex. 1, 11/6/01 entry.) Evergreen's representative was

---

[7] Specifically, the contract states: "[I]n the event of cancellation or expiration of any [insurance] policy during the term of this contract without replacement by Buyer within 10 days, such failure shall constitute an event of default hereunder. . . . Upon the occurrence of any event of default, . . . the Holder [may] . . . take immediate possession of the Motor Vehicle, with or without judicial process . . . ." (Defs.' LR Ex. D.)

[8] In addition to the account ledger statements, Defendants submitted the affidavit of Robert Tomczak, the Manager of Evergreen (Defs.' LR Ex. J), who was also deposed (see 10/17/03 Tomczak Dep). Mr. Tomczak spoke to Ms. Nevarez about the insurance problem, made the entries on the account ledger relating to Evergreen's repossession of the Mountaineer, and ordered the repossession. (Id. at 75-78.) Plaintiffs do not object to Defendants' use of the account ledger statements, except to argue that the account ledger was printed in November 2003 and there is "no way to determine what the notes looked like in November 2001." (Pls.' Opp'n at 13.) [Dkt 117.] However, Plaintiffs have not presented any evidence that the statements were falsified or unreliable, and they are supported by Mr. Tomczak's testimony.

advised that the insurance on the Mountaineer had been cancelled on October 9, 2001 for non-payment and there was no coverage for the vehicle. (Pls.' LR Resp. ¶ 29; Pls.' LR Ex. 1, 11/6/01 entry.) Evergreen's representative attempted to reach the Nevarezes that same day by calling them at home and at work, but was unsuccessful. (Pls.' LR Resp. ¶¶ 30, 31.) The representative left a message for Mr. Nevarez to return the call. (Pls.' LR Resp. ¶ 31; Pls.' LR Ex. 1, 11/6/01 entry.) The representative also sent a letter to the Nevarezes concerning the lack of insurance, although the Nevarezes do not recall receiving that notice. (Pls.' LR Resp. ¶ 32; Pls.' LR Ex. 1, 11/6/01 entry.)

On November 7, 2001, Evergreen called the Nevarezes' insurance company again, and was advised that the policy was still cancelled and that there had been no insurance on the vehicle for the past 29 days. (Pls.' LR Resp. ¶ 33; Pls.' LR Ex. 1, 11/7/01 entry.) The Evergreen representative spoke to Ms. Nevarez that day and advised her of the issue regarding the lack of insurance. (Pls.' LR Resp. ¶ 34; Pls.' LR Ex. 1, 11/7/01 entry.) The following day, November 8, 2001, Evergreen was again told that the Nevarezes' insurance policy was still cancelled. (Pls.' LR Resp. ¶ 35; Pls.' LR Ex. 1, 11/8/01 entry.) An Evergreen representative called Ms. Nevarez again regarding the issue, and a conversation ensued during which Ms. Nevarez insisted that she had insurance. (Pls.' LR Resp. ¶ 36; Pls.' LR Ex. 1, 11/8/01 entry.) The next day, November 9, 2001, Evergreen was advised again by the Nevarezes' insurance company that the Nevarezes' policy was still cancelled. (Pls.' LR Resp. ¶ 37; Pls.' LR Ex. 1, 11/9/01 entry.) Apparently, Evergreen was also advised that the Nevarezes needed to pay $84 to reinstate the policy. (Pls.' LR Resp. ¶ 37; Pls.' LR Ex. 1, 11/9/01 entry.) Evergreen sent another letter to the Nevarezes about their lack of insurance that day. (Pls.' LR Resp. ¶ 38; Pls.' LR Ex. 1, 11/9/01 entry.)

Three days later, on November 12, 2001, Evergreen was advised once again by the

Nevarezes' insurance company that the policy was still cancelled. (Pls.' LR Resp. ¶ 39; Pls.' LR Ex. 1, 11/12/01 entry.) Evergreen left a message at the Nevarezes' home asking for a return call, and ordered a repossession of the vehicle that day. (Pls.' LR Resp. ¶¶ 40, 41; Pls.' LR Ex. 1, 11/12/01 entries.)

An entry dated the following day, November 13, 2001, states, "Co[mpany] said Ins[urance] co[mpany] made mistake, she has ins[urance], adv[ised] we have car [and] I w[ill] verify ins[urance] & call her back." (Pls.' LR Ex. 1, 11/13/01 entry.) Another entry from November 13, 2001 states, "Ph[oned] Magnum . . . , Policy reinstated as of 11/12/01. 33 days no insurance." (*Id.*) Evergreen was sent an Insurance Reinstatement Notice the following day, November 14, 2001, two days after the repossession had been ordered. (Pls.' LR Ex. 12 at 1; Pls.' LR Ex. 1, 11/14/01 entry.) The Insurance Reinstatement Notice indicates that reinstatement of the Nevarezes' policy had been requested on November 9, 2001, because "payment ha[d] been received to bring the account up to date," but does not indicate when the reinstatement request was granted, or that Evergreen was ever made aware of the reinstatement prior to November 14, 2001. (Pls.' LR Ex. 12 at 1-3.) There is no dispute that the Nevarezes' insurance policy had, in fact, been cancelled for over a month prior to that time. (Leticia Nevarez Dep. at 97.) Ms. Nevarez testified that she was told that her insurance was cancelled due to late payments, possibly because her payment checks had to be forwarded by the insurance agency in Chicago to a company in Florida. (*Id.* at 95-97.)

## LEGAL STANDARD

The legal standards for summary judgment which were set out in the first *Nevarez* opinion apply to the present motion. *See Nevarez*, 303 F. Supp. 2d at 932-33.

# DISCUSSION

## A. Plaintiffs' Illinois Consumer Fraud Act ("ICFA") Claim For Misrepresentations and Omissions (Count V)

The ICFA prohibits, *inter alia*, the "omission of any material fact, with intent that others rely upon the . . . omission . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. § 505/2. To succeed on a private cause of action under this statute, a plaintiff must prove: (1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that the plaintiff rely on that misrepresentation or concealment; (3) the deception occurred in the course of conduct involving trade or commerce; and (4) the misrepresentation or concealment proximately resulted in damages. *Mackinac v. Arcadia Natl. Life Ins. Co.*, 648 N.E.2d 237, 239 (Ill. App. 1st Dist. 1995); *Miller v. William Chevrolet/GEO*, 762 N.E.2d 1, 11-12 (Ill. App. 1st Dist. 2001); *L.R.J. Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 53 (7th Cir. 1995); *Oshana v. The Coca-Cola Co.*, 225 F.R.D. 575, 585 (N.D. Ill. 2005).

The Nevarezes allege that each of the following eleven omissions constitutes an unfair and deceptive practice in violation of the ICFA:

(1) O'Connor's failure to tell the Nevarezes that the car did not include a new warranty (Third Am. Compl. ¶ 109(1));

(2) O'Connor's failure to tell the Nevarezes that they were paying for a service contract in the amount of $1,495.00 (*id.* ¶ 109(2));

(3) O'Connor's failure to tell the Nevarezes that O'Connor would be retaining a portion, if not all, of several fees included in the "amounts paid to others" section of the contract, including the Lyndon American service contract (*id.* ¶ 109(3));

(4) O'Connor's failure to tell the Nevarezes that the $50.00 documentary fee was not an official title fee but a fee that was going to O'Connor (*id.* ¶ 109(4));

-10-

(5)    O'Connor's failure to tell the Nevarezes that Household might have accepted assignment of the original May 5 contract (*id.* ¶ 109(5));

(6)    O'Connor's failure to tell the Nevarezes that they had a right to the return of their down payment before signing the May 19 contract (*id.* ¶ 109(6));

(7)    O'Connor's failure to tell the Nevarezes that the interest rate on the May 19 contract was higher than the rate originally promised (*id.* ¶ 109(7));

(8)    O'Connor's failure to tell the Nevarezes on May 5, 2001 that they might have to sign a second contract and that the $5,000 down payment would be insufficient (*id.* ¶ 109(8));

(9)    O'Connor's failure to tell the Nevarezes that the terms of the contract would have been more favorable if they had had Mr. Huerta as a co-signer (*id.* ¶ 109(9));

(10)    O'Connor's failure to tell the Nevarezes that Caryl O'Connor was the owner of both the dealership and the finance company, *i.e.*, that the two companies were jointly owned (*id.* ¶ 109(10)); and

(11)    O'Connor's failure to tell the Nevarezes that they were signing a wage assignment (*id.* ¶ 109(11)).

(*See also id.* ¶¶ 107, 109.) Plaintiffs also allege that Defendants misrepresented that a 20.95% APR was the best rate available to the Nevarezes. (*Id.* ¶ 111.)

Defendants argue that they are entitled to summary judgment on Count V because the purported omissions: (1) do not concern omissions of fact; (2) were disclosed in writings which Plaintiffs signed; or (3) cannot be construed as "material." (Defs.' Mem. at 11-13.) [Dkt 103.] Thus, Defendants' arguments focus on the first element of an ICFA claim, namely, whether the omissions constitute the *concealment* of a *material fact*. Plaintiffs respond that by failing to disclose critical facts to the Nevarezes and never translating the contracts into Spanish, O'Connor induced them to purchase the Mountaineer under the less advantageous terms of the May 19 contract. (Pls.' Opp'n at 3.)

## 1. Omissions of Fact

A complaint under the ICFA must be pled with the same specificity as that required under common law fraud. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005) (citation omitted). On a summary judgment motion, the court looks to see whether there is evidence to support the claims specifically pled. Here, Plaintiffs allege that O'Connor "[f]ail[ed] to tell [them] that Household Finance might have accepted assignment of the original May 5, 2001 contract." (Third Am. Compl. ¶ 109(5).) Defendants correctly observe that Household Finance actually *declined* the terms of the May 5 contract. There is no evidence that Household might have accepted the original May 5 contract; there is only evidence that Household *might* have accepted a contract with *different* terms and if other contingencies were met. Plaintiffs identify no evidence supporting their allegation, nor do they squarely address Defendants' argument. Plaintiffs argue that "knowing what other financing sources were available to them would have been a critical fact impacting their purchase decision" and that they were led to sign a contract with less favorable terms as they believed that to be their only option. (Pls.' Opp'n at 4-5.) However, even assuming *arguendo* that Plaintiffs' complaint can be stretched to encompass that argument, that Household might have financed the Plaintiffs' purchase on terms different than those in the agreement reached between Plaintiffs and Defendants is not a fact. It is merely speculation about a contingent event. *See Sohaey v. Van Cura*, 607 N.E.2d 253, 272 (Ill. App. 2nd Dist. 1992) (stating that "[s]tatements relative to future or contingent events, expectations, or probabilities are generally regarded as mere expressions of opinion or conjectures," which will not support an ICFA action).[9]

---

[9] Defendants also argue that Plaintiffs' ICFA claim fails because Defendants had no duty to inform Plaintiffs of alternative financing options. (Defs.' Mem. at 10-11.) "[I]n order to state a claim for concealment under the [IFCA], plaintiff must show that defendant remained silent under circumstances creating a duty to speak." *Mackinac,* 648 N.E.2d at 240 (citations omitted).

Likewise, Plaintiffs cannot succeed on their claim that O'Connor "[f]ail[ed] to tell [them] that the terms of the . . . contract would have been more favorable if they had had Mr. Huerta as a co-signer." (Third Am. Compl. ¶ 109(9).) For that claim, which was also required to have been pled with specificity, Plaintiffs rely on the Banco Popular Notification and the Harris Bank credit decision. (Pls.' Opp'n at 5, 10.) As discussed above, there is no evidence that O'Connor was aware of the Harris Bank credit decision before Plaintiffs signed the May 19 contract and, therefore, it cannot support Plaintiffs' claim. *See Sohaey*, 607 N.E.2d at 273 (finding no violation of ICFA where plaintiffs failed to show that defendant was aware of the falseness of his representations at the time they were made).

The Banco Popular Notification is also insufficient. As stated above, to support an ICFA claim, the omission must be of a *fact*. Here, like Household's conditional approval, the Notification is evidence of no more than a *possibility* of financing. It states, "Adverse Action Reasons: collateral not sufficient." (Pls.' LR Ex. 5.) It also suggests some alternative terms including "additional down payment" of some unspecified amount. Plaintiffs have identified no other evidence supporting their allegation that a loan to Mr. Huerta was approved by Banco Popular. In addition, the Notification does not support Plaintiffs' claim that Mr. Huerta was approved, even conditionally, as a co-signer for the Nevarezes. The face of the Banco Popular Notification contains no reference to the Nevarezes. It lists the "Applicant" as Mr. Huerta; the space for "Co-Applicant" is blank. Plaintiffs have identified no other evidence that Mr. Huerta was conditionally approved by Banco Popular (or any other institution) as co-signer to a loan to finance a purchase by the Nevarezes. Because the Banco Popular Notification is evidence of no more than a possibility, and because it refers only to

---

However, because summary judgment is granted for the reasons set out in this opinion, it is not necessary to address that argument.

Mr. Huerta and not to the Nevarezes, Plaintiffs cannot rely on it to support their claim that O'Connor omitted the purported fact that the terms of their contract would have been more favorable with Mr. Huerta as co-signer. The conclusion that the Household and Banco Popular notifications are not sufficient to allow Plaintiffs to recover under the ICFA is reinforced by the Illinois Supreme Court's decision in *Avery v. State Farm Mutual Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005), *cert. denied*, — S. Ct. —, 2006 WL 521226 (Mar. 6, 2006). In *Avery*, the court emphasized that to succeed under the ICFA, a plaintiff must prove actual damages, that is, "real or measurable damages," proximately caused by the defendant's violation of the ICFA. 835 N.E.2d at 858-61. Here, Plaintiffs have never stated that they or Mr. Huerta would have accepted the alternative terms if they had known of them. Plaintiffs only assert that knowing that other companies might have financed Jesus Nevarez or Juan Huerta was "a material fact," which is a legal conclusion. (Pls.' LR Stmt ¶ 11.) In light of the record before the court, which includes the contingent nature of Household and Banco Popular's approval and the incomplete terms of the Banco Popular Notification, as well as the testimony by Household's officer that Household might have declined to finance the Nevarezes even under the alternative terms, Plaintiffs cannot demonstrate that they incurred real or measurable damages proximately caused by Defendants' failure to inform them of those notifications.

Similarly, Plaintiffs cannot rely on the alleged misrepresentation that they were receiving the "best [APR] rate available" (Third Am. Compl. ¶ 111), because it is only an expression of opinion. *Sohaney*, 607 N.E.2d at 272; *see also In re Estate of Albergo*, 656 N.E.2d 97, 107 (Ill. App. 2nd Dist. 1995) (stating that expressions of opinion do not support an action under the ICFA).

Plaintiffs also allege that O'Connor failed to inform Plaintiffs of their right, pursuant to Section 2C of the ICFA (815 Ill. Comp. Stat. § 505/2C), to the return of their down payment.

Defendants argue that failing to make a disclosure of law is generally not actionable under the ICFA as an omission of fact. *See e.g, Randels v. Best Real Estate, Inc.*, 612 N.E.2d 984, 987-89 (Ill. App. 2nd Dist. 1993) (holding that a failure to disclose law is not actionable because both parties are presumed to be equally capable of knowing and interpreting the law.) Plaintiffs do not respond to Defendants' argument, and do not point to any law specifically requiring a car dealer to make that disclosure. Thus, that allegation cannot support Plaintiffs' claim under the ICFA.

### 2. Omissions Disclosed in Writings Signed by Plaintiffs

Defendants next argue that a number of the claimed omissions cannot be the subject of a claim under the ICFA because they were disclosed in writings that Plaintiffs themselves signed. (Defs.' Mem. at 11-12.) Defendants state that the following alleged omissions were disclosed in the May 19 contract or the affidavit of spot delivery signed by Mr. Nevarez: (1) that the car did not include a new warranty (Third Am. Compl. ¶ 109(1)); (2) that the Nevarezes were paying $1,495.00 for a service contract (*id.* ¶ 109(2)); (3) that the $50.00 documentary fee was not an official title fee but a fee that was going to O'Connor (*id.* ¶ 109(4)); (4) that the interest rate on the May 19 contract was higher than the rate originally promised (*id.* ¶ 109(7)); (5) that the Nevarezes were signing a wage assignment (*id.* ¶ 109(11)); and (6) that the Nevarezes might have to sign a second contract and the $5,000 down payment would be insufficient (*id.* ¶ 109(8)). (Defs.' Mem. at 11-12.) The same argument applies to O'Connor's retaining a portion of certain fees included in the "amounts paid to others" section of the contract (Third Am. Compl. ¶ 109(3)), because the May 19, 2001 contract stated that O'Connor "may be retaining a portion of these amounts." (Defs.' Reply at 5.)

Plaintiffs apparently do not dispute that the information was contained in writings they

signed, but argue that O'Connor had a legal duty to translate the contract and the affidavit of spot delivery pursuant to Section 2N of the ICFA, and that O'Connor assumed a duty when it advertised that it spoke Spanish. (Pls.' Opp'n at 8-9.) Although Plaintiffs have a separate claim for violation of Section 2N, they argue that the failure to translate the documents also gives rise to an additional, independent claim under the ICFA because the untranslated statements in those documents were "concealed" from the Nevarezes.

Although the ICFA does not require a plaintiff to show actual reliance or diligence in ascertaining the truth, the allegedly deceptive act must be looked upon in light of "the totality of the information made available." *Davis*, 396 F.3d at 884. In *Davis*, the Seventh Circuit agreed that there was no evidence to support a claim under the ICFA where the plaintiffs agreed to a five-year prepayment penalty as set out in a document the plaintiffs actually signed, which they never challenged. *Id.*

In this case, the only basis upon which Plaintiffs claim the information was "concealed" is the fact that the information was not translated into Spanish. Plaintiffs do not cite any cases bearing on this issue. Instead, Plaintiffs rely entirely on Section 2N of the ICFA, which at the time of the Nevarezes' transaction required that certain documents be translated in certain circumstances. 815 Ill. Comp. Stat. § 505/2N (2000). (Pls.' Opp'n at 8-9.)

In the absence of any Illinois authority supporting Plaintiffs' position, the court cannot accept Plaintiffs' argument that the failure to translate a document (which may or may not be a violation of Section 2N, an issue which has not yet been decided) also creates a separate violation of the ICFA in the form of a failure to disclose all of the information set out in that document. Plaintiffs' proposed claim is inconsistent with the existence of a separate section of the IFCA setting out

-16-

particular obligations when a person conducts a retail transaction or negotiation in a language other than English. In short, Plaintiffs cannot bring a separate claim under ICFA Section 2 for omission of a material fact simply because the document in which the information was disclosed was not translated.[10]

### 3.   Materiality of Omissions

Finally, Defendants argue they are entitled to summary judgment with respect to the following purported omissions because they were not "material": (1) O'Connor's failure to tell the Nevarezes that O'Connor would be retaining a portion, if not all, of several fees included in the "amounts paid to others" section of the contract (Third Am. Compl. ¶ 109(3)); (2) O'Connor's failure to tell the Nevarezes that the $50.00 documentary fee was going to O'Connor (*id.* ¶ 109(4)); and (3) O'Connor's failure to tell the Nevarezes that Caryl O'Connor was the owner of both the dealership and the finance company (*id.* ¶ 109(10)). (Defs.' Mem. at 12-13.)   In addition, Defendants argue that even if the alleged omissions were material, Defendants cannot be liable because there is no evidence that O'Connor intended that Plaintiffs rely on the omissions when deciding whether to buy the vehicle. (*Id.*)

"An omission is 'material' if the plaintiff would have acted differently had she been aware of it, or if it concerned the type of information upon which she would be expected to rely in making her decision to act." *Mackinac*, 648 N.E.2d at 239 (citation omitted); *see also L.R.J. Ryan*, 59 F.3d at 54 ("To be material under Illinois law, the misrepresented fact must be essential to the transaction

___

[10]   Defendants make an additional argument that O'Connor's omissions regarding the "amounts paid to others" section of the contract complied with the Truth in Lending Act ("TILA"), and that compliance with TILA is a defense to liability. (Defs.' Reply at 4-5.)  It is not necessary to address that argument.

between the parties.") (citation omitted). "The test for materiality is an objective one – whether a reasonable person could be expected to rely on the information." *Oshana v. The Coca-Cola Co.*, No. 04 C 3596, 2005 WL 1661999 at *8, 9 (N.D. Ill. July 13, 2005) (Conlon, J.).

The section of the May 19 contract listing "Other Charges Including Amounts Paid to Others On Your Behalf" states the following in bold print: "The Seller/Creditor may be retaining a portion of these amounts." (Defs.' LR Ex D.) The contract also states, again in bold print, "The documentary fee is not an official fee. A documentary fee is not required by law, but may be charged to buyers for handling documents and performing services related to the closing of a sale." (*Id.*) Thus, the fact that O'Connor might retain some of those amounts was expressly disclosed. Apparently, Plaintiffs' argument is that the exact amount that O'Connor would retain (approximately $250 of the $1,495 charge for the service contract and $300 of the $495 GAP insurance premium) was not disclosed. (*See* Pls.' Opp'n at 6.) In light of the contract's express disclosure that O'Connor would be retaining some of the amounts paid to others and the disclosure relating to the documentary fee, the evidence does not support Plaintiffs' claim that a failure to disclose the exact amount was "material," *i.e.*, essential to the Nevarezes' decision to enter into the May 19 contract. To start, Ms. Nevarez admitted that Soto discussed the service contract, including the amount being charged for it, but she could not recall what he said. (Leticia Nevarez Dep. at 73-74.) As for whether the amounts were "essential" to the transaction, when asked by his counsel whether he would have purchased the Mountaineer if he had known the $50.00 documentary fee was being kept by O'Connor, Mr. Nevarez responded only, "I don't think so." (Defs.' 08/19/03 Mot. Sum. J., Ex. A, Jesus Nevarez Dep. at 77 [dkt 57].) Ms. Nevarez' affidavit states that had she and Mr. Nevarez known that some of these amounts would go to O'Connor, she would have tried to negotiate a lower

price for the service contract (Leticia Nevarez Decl. ¶ 6), but she testified:

> All my husband wanted was to get out of there as quickly as possible because they were making us - - saying you have to pay this; that, and asking for more money basically. He said let's get out of here before they ask us for more money.

(Leticia Nevarez Dep. at 142.)

Based on the evidence in the record, a reasonable jury could not determine that the fact that $200 of the $1,495 Lyndon American service contract, $300 of the $495 GAP insurance premium, and the $50.48 documentary fee would go to O'Connor was an undisclosed material fact.

The same is true with respect to the omission regarding Caryl O'Connor's joint ownership of O'Connor and Evergreen. Plaintiffs cite Ms. Nevarez's testimony that she would have wanted to know that the same owner owned both Evergreen and O'Connor. (*Id.* at 140-41.) As Defendants point out, however, Ms. Nevarez testified that was her way of "looking at things *now*." (*Id.* at 141 (emphasis added).) She also testified that if she had known that the owners of Evergreen and O'Connor were the same, she perhaps would *not* have done anything differently. (*Id.* at 139-40.) The testimony of Ms. Nevarez on this issue is insufficient to raise a genuine issue of material fact as to whether O'Connor's failure to disclose the joint ownership of O'Connor and Evergreen was material to the transaction.

Because the alleged omissions and misrepresentation fail to support Plaintiffs' ICFA claim, summary judgment is granted on Count V.[11]

---

[11] Because summary judgment is granted in favor of Defendants on Count V for the reasons stated above, Defendants' other arguments, including Defendants' argument that Evergreen should not be held responsible for the alleged violations because Plaintiffs have not asserted that Evergreen committed any of the purported fraudulent acts (Defs.' Reply at 5-6), need not be addressed.

## B.    Plaintiffs' Wrongful Possession Claim (Count VII)

In Count VII, Plaintiffs claim that Evergreen wrongfully repossessed the Mountaineer because, Plaintiffs claim, they had maintained insurance on the vehicle and therefore their account with Evergreen was not in default at the time of the repossession. (Third Am. Compl. ¶¶ 128, 130-32.) Defendants argue that they are entitled to summary judgment on this count because Evergreen did not wrongfully repossess the Mountaineer. (Defs.' Mem. at 14-15.)

Under the May 19 contract, Plaintiffs were required to keep the vehicle fully insured; a failure to keep it insured would constitute a default under which Evergreen was entitled to immediate possession of the vehicle. (Defs.' LR Ex. D; Pls.' LR Resp. ¶¶ 25, 26.)[12] Defendants argue that Evergreen repossessed the vehicle only after ascertaining on numerous occasions that Plaintiffs' insurance on the vehicle had been cancelled. (Defs.' Mem. at 14.) Plaintiffs argue that there is a dispute as to whether the Mountaineer was insured during November 2001 when the vehicle was repossessed. (Pls.' Opp'n at 12.)

The undisputed evidence establishes that Evergreen was advised by the Nevarezes' insurance company on numerous occasions between November 6 and November 12, 2001 that the insurance policy had been cancelled as of October 9, 2001 for non-payment. It also establishes that Evergreen's representative contacted Ms. Nevarez by telephone at least twice about the lack of insurance, and also wrote to her on November 7 and 9, 2001. It is undisputed that Plaintiffs' insurance had been cancelled in October, and that the insurance had not been reinstated within ten days of cancellation. Evergreen ordered a repossession of the vehicle on November 12, 2001 only

---

[12] (*See* n. 7, above, for text of relevant provision.)  As Defendants note, the same recourse was available to them under the Illinois Commercial Code, 810 Ill. Comp. Stat. § 5/9-609.

after being advised by the insurance company that there was still no insurance on the vehicle.[13] An entry from Evergreen's Account Ledger for November 13, 2001 states that there had been "33 days [of] no insurance," which was 23 days more than the ten day cure period in the contract. Therefore, Plaintiffs had defaulted on the contract, which required Plaintiffs to keep the vehicle "fully insured . . . for the entire term of the contract." (Defs.' LR Ex. D.) Indeed, at the time Evergreen ordered the repossession, it had just been advised that the policy was still cancelled. Accordingly, Evergreen was within its rights to repossess the Mountaineer pursuant to the May 19 contract and the Illinois Commercial Code.

Plaintiffs claim that Evergreen is at fault because it called the Nevarezes' insurance company "prematurely" to check on the status of the Nevarezes' insurance. (Pls.' Opp'n at 12.)[14] However, as Defendants point out, Plaintiffs cite no law or authority which prevents a lender from checking to make sure a borrower keeps insurance on a vehicle. (Defs.' Reply at 6.) When questioned further about this point at oral argument, Plaintiffs' counsel acknowledged that there was nothing in the contract which would have prohibited Evergreen from calling the Nevarezes' insurance company at any time to check on the status of their insurance.

Finally, Plaintiffs argue that Evergreen's repossession was also wrongful because there was no valid contract granting Evergreen a security interest in the Mountaineer. (Pls.' Opp'n at 14-15.)

---

[13] Plaintiffs invite the court to speculate that the reinstatement was in place before the repossession was ordered and that the insurance company was incorrect when it advised Evergreen that the policy was still cancelled, but there is no evidence to that effect. More importantly, however, there is no question that Plaintiffs had defaulted on the contract prior to the repossession in November 2001, and that default entitled Evergreen to repossess the vehicle.

[14] Plaintiffs state that Evergreen's account ledger "incorrectly" listed November 5, 2001 as the date that the Nevarezes' insurance was to expire. (Pls.' LR Stmt. ¶ 21.) Defendants dispute that statement. (Defs.' LR Resp. ¶ 21.) However, that dispute is not material to the outcome of the motion.

-21-

In support of that argument, Plaintiffs argue that the contract was a nullity because O'Connor did not comply with Section 2N of the ICFA (as alleged in Count III). (*Id.* at 15.) However, Plaintiffs do not explain how, if the contract was void, Plaintiffs had any right to possess the Mountaineer. If Plaintiffs lack a right to possess the vehicle, they cannot argue that the vehicle was wrongfully repossessed.

Because Plaintiffs have not raised a genuine issue of material fact on this issue, Defendants are entitled to summary judgment on Count VII as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Counts V and VII is granted. A status hearing will be held in this matter on April 10, 2006 at 11:00 a.m.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: March 29, 2006**